John David BATTAGLIA, Appellant

v.

The STATE of Texas

NO. AP-77,069

Court of Criminal Appeals of Texas.

DELIVERED: September 20, 2017

Michael Mowla, P.O. Box 868, Cedar Hill, TX 75106, for Appellant.

Christine Womble, Criminal District Attorney Assistant District Attorney, Dallas County, Texas State Bar No. 24035991, Frank Crowley Courts Bldg, 133 N. Riverfront Blvd., LB–19, Dallas, Texas 75207–4399, Stacey Soule, Austin, TX, for the State.

## OPINION

Richardson, J., delivered the opinion of the Court in which Keller, P.J., and Keasler, Hervey, Yeary, Newell, Keel, and Walker, JJ. joined.

In 2002, Appellant, John David Battaglia, was convicted and sentenced to death

for shooting and killing his two young daughters in his apartment while they were talking to their mother on speaker phone. In 2016, shortly before his execution date, Battaglia filed a motion claiming that he "is incompetent to be executed." [1] After an evidentiary hearing was held in November of 2016, the trial court found that Battaglia is competent to be executed. [2] Although three mental health experts believed Battaglia to be incompetent, the trial court found most credible the fourth expert who concluded that Battaglia is competent to be executed. Battaglia appealed the trial court's decision to this Court. We stayed Battaglia's execution to determine whether the trial court abused its discretion. After a thorough review of the record, we affirm the trial court's decision finding Battaglia competent to be executed. The stay of execution is lifted, and the case is remanded to the trial court to set Battaglia's execution date.

## BACKGROUND

### A. The Murders

John Battaglia was married to his second wife, Mary Jean Pearl, for nine years. They had two daughters—Faith and Liberty. The couple separated in 1999 and divorced in 2000. According to Mary Jean, Battaglia had been verbally abusive toward her during their entire nine-year marriage. When Mary Jean testified at Battaglia's trial, she described one Christmas morning after the divorce. Battaglia and his daughter from a previous marriage, Kristy, came to Mary Jean's house to pick up Faith and Liberty for church. Battaglia and Mary Jean argued, and in his anger Battaglia physically assaulted Mary Jean in front of the three girls. She described how he "pounded" on her, pulled her hair, pushed her to the floor and kicked her, all while the girls were crying and begging him to stop. He left her house, and she called 911. Mary Jean was black and blue behind her head and she had a puncture wound in her heel and bruises on her arm, finger, shin, and both sides of her head. Battaglia was convicted of assault and placed on probation.

The following Easter, Mary Jean gave Kristy an Easter gift of $50. Mary Jean said that her gift to Kristy prompted Battaglia to leave a message on the answering machine that Mary Jean had set up in the girls' room: "Mary Jean, the next time you give my daughter $50 why don't you tell her how you screwed her out of her college fund, you fucking pig. How does that feel, pig?" Mary Jean reported receiving that message to the police and to Battaglia's probation officer. A warrant was then issued for Battaglia's arrest for violating his probation. On May 2, 2001, a police officer told him that he needed to make arrangements to turn himself in.

That evening, Battaglia had a regular dinner visit with Faith and Liberty. Mary Jean said that she drove the two girls to

---

1. TEX. CODE CRIM. PROC. art. 46.05(a) ("A person who is incompetent to be executed may not be executed.")

2. Because Battaglia's competency was evaluated by four forensic psychologists—and the trial court rendered its decision regarding his execution competency—back in 2016, it would be logical to refer to Battaglia's state of execution competency in the past tense, as opposed to the present tense. However, although execution competency has the poten-

tial to vary like a "moving target," see *Poland v. Stewart,* 41 F.Supp.2d 1037, 1041 (D. Ariz. 1999), a person is competent to be executed unless proven otherwise. *Wood v. Thaler,* 787 F.Supp.2d 458, 487 (W.D. Tex. 2011) ("A State may presume the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence.") (citing *Cooper v. Oklahoma,* 517 U.S. 348, 355, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)).

Highland Park Village parking lot in Dallas where Battaglia picked them up. She said she waited to see that the girls were safely in his car, and then she drove to her friend Melissa's house. Battaglia was supposed to bring the girls back to Melissa's house after dinner. Mary Jean testified that, as she pulled into Melissa's driveway, her mother called her cell phone to tell her that Battaglia had called because the girls wanted to ask Mary Jean something. So Mary Jean went into Melissa's house and called Battaglia's number. Battaglia answered, then put the phone on speaker mode, and instructed Faith to "ask her." Mary Jean then heard Faith ask, "Mommy, why do you want Daddy to go to jail?" Then Mary Jean heard Faith say, "No, Daddy, please don't, don't do it." Mary Jean yelled into the phone, "Run, run for the door!" She heard gunshots and her daughters' screams. She then heard Battaglia yell "Merry Fucking Christmas!" Mary Jean called 911 and drove to Battaglia's apartment. He had already left. The police discovered the girls' bodies in Battaglia's apartment. Nine-year-old Faith was found by the kitchen phone with three gunshot wounds, and six-year-old Liberty was found ten to fifteen feet from the front door with four gunshot wounds and a graze wound to the top of her head. Later that night, Battaglia was arrested outside a tattoo parlor where he had gone with his girlfriend. It took four officers to restrain and handcuff him.

Mary Jean testified that the day after the murders she went to her house to retrieve the answering machine from the girls' bedroom. The message left on the girls' answering machine was from Battaglia:

Good night my little babies. I hope you're resting in a different place. I love you. I wish that you had nothing to do with your mother. She was evil, vicious, stupid. You will be free of her. I love you very dearly. You were very brave girls. Very brave. Liberty, you were oh so brave. I love you so much. Bye.

## B. The Procedural Background

After the State presented its case-in-chief, the defense chose to not call any witnesses. In fact, Battaglia took the stand and testified that he agreed with his attorney's strategy to rest his case at that time. The closing argument presented by defense counsel did not articulate any type of defense to the crime, and counsel emphasized that this was not a case of insanity:[3] "Certainly, there was no evidence brought to you of any type of insanity."

The jury found Battaglia guilty of capital murder. During the punishment phase, the defense presented the testimony of a forensic psychiatrist, Dr. Judy Stonedale, who testified that Battaglia had suffered from bipolar disorder since his mid-to-late twenties. She said that some people with bipolar disorder have psychotic episodes and lose touch with reality. She testified that bipolar disorder is a chemical imbalance and Battaglia knew what he was doing, but that he was experiencing a psychotic episode at the time he killed his daughters. The defense also called Dr. Edward Gripon, a forensic psychiatrist who had been appointed by the trial court to evaluate Battaglia. Dr. Gripon also testified that Battaglia had bipolar disorder. At the time he murdered his children, however, Battaglia knew what he was doing and knew that it was wrong.

---

3. *See* Tex. Penal Code § 8.01 ("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.").

Forensic psychiatrist, Dr. Richard E. Coons, testified for the State on rebuttal. Dr. Coons concluded that Battaglia killed his children as an act of anger and retribution to punish Mary Jean. He believed that Battaglia had a mild form of bipolar disorder, but that he also had antisocial personality disorder such that he rationalized and blamed others for his actions. Dr. Coons testified that Battaglia had told him that "all [he] wanted to do was to get the girls out of trouble, so they wouldn't be drug addicts, strippers, hate their parents, or be prostitutes." Dr. Coons believed Battaglia was rationalizing why he killed his two daughters.

The defense called a rebuttal witness, Dr. Jay Douglas Crowder, who testified that Battaglia had "immature personality disorder." Dr. Crowder said that Battaglia's mental illness was a contributing factor in his commission of the offense and that he would not have committed the murders had he been on mood-stabilizing medication at the time. Dr. Crowder admitted, however, that when Battaglia killed his children, "he made a decision to do it and he knew the wrongfulness of his actions." Battaglia took the stand again at the conclusion of the punishment phase of the trial and said that he did not wish to testify, but that it was his intention to rest on the issue of punishment. During the punishment phase closing argument, Battaglia's counsel stated that the defense "never inferred to anybody that there was an issue in this case about the guilt or innocence of John Battaglia. Never tried to raise that issue." And at that time, he reiterated that insanity "was never an issue in this case." It was clear that the defense strategy was to take responsibility for having committed the offense, but

avoid the death penalty by arguing that Battaglia was mentally ill: "John Battaglia is acting and suffering from a mental illness," and he should not be executed because he was "in the throws [sic] of a severe mental illness" when he killed his daughters.

Battaglia was sentenced to death. His conviction and sentence were affirmed on direct appeal to this Court.[4] Most of the issues raised on direct appeal asserted errors related to the punishment phase of the trial. Battaglia did, however, raise an issue complaining of the admission of extraneous-act evidence at the guilt phase. The State's theory of the case was that Battaglia committed the murders as an act of vengeance against Mary Jean. So the State offered, and the trial court allowed, evidence of Battaglia's assaultive and abusive behavior toward Mary Jean during the course of their marriage to show motive—that he killed the girls to punish Mary Jean. On direct appeal, this Court held that the admission of such evidence was not reversible error because it was neither probative nor prejudicial—"[t]he motive evidence in this case was, in fact, not particularly probative or prejudicial of a *disputed* issue because the overwhelming evidence supported [Battaglia's] guilt."[5]

Although Battaglia has never claimed that he was legally insane, he asserted on direct appeal that his mental illness should prevent him from receiving the death penalty because mental illness impairs understanding and functioning in ways that substantially reduce personal culpability.[6] He argued that mentally ill persons, such as himself, do not have the same capacity as others to appreciate the consequences of

4. *Battaglia v. State,* No. AP-74, 2005 WL 1208949, at *11 (Tex. Crim. App. May 18, 2005) (not designated for publication).

5. *Id.* at *7.

6. *Id.* at *10.

their actions, and do not possess the requisite level of culpability to warrant a death sentence.[7] Battaglia also claimed that imposition of the death penalty on mentally ill defendants violates the Eighth Amendment of the United States Constitution.[8] However, this Court declined "to extend the federal constitutional proscription against execution of the insane to the greater category of mentally ill defendants."[9]

> [Battaglia] does not contend that he was or is insane or mentally retarded. Rather, he points to expert testimony at trial stating that his mental illness, bipolar disorder, was a contributing factor in the commission of the offense. He argues that his mental illness caused his reasoning to be impaired, diminished his capacity to evaluate the consequences of his actions, and rendered him unable to conform his behavior to society's norms. *But there is no Supreme Court authority or authority from this Court suggesting that mental illness which is a "contributing factor" in the defendant's actions or that caused some impairment or some diminished capacity is enough to render one immune from execution under the Eighth Amendment.* Certainly the issues concerning [Battaglia's] mental illness were relevant to the question of mitigation and were properly presented and argued at punishment.[10]

Battaglia filed an Article 11.071 [11] writ application with this Court. This Court agreed with the trial court's findings of fact and conclusions of law and denied relief.[12]

Battaglia then filed for federal habeas relief. Among his federal claims was one asserting that he is entitled to relief because his mental illness should have prevented him from receiving the death penalty. The federal district court addressed this argument by comparing Battaglia's claim to one unsuccessfully made by Mississippi death-row inmate Edwin Hart Turner:

> Turner raises no viable legal claims. Turner does not claim that he is mentally retarded, or that he was under the age of 18 at the time of his offense. Rather, he argues that the Constitution bars the execution of "individuals with severe mental disorders or disabilities, which, at the time of the offense, impaired [their] ability (a) to appreciate the nature, consequences or wrongfulness of [their] conduct; (b) to exercise rational judgment in relation to [their] conduct; or (c) to conform [their] conduct to the requirements of the law." *He cites no legal authority for this proposition, and, in fact, we have repeatedly rejected requests to hold that generalized allegations of mental illness bar execution.* Accordingly, even if Turner received access to his experts and even if these experts were able to conclusively prove that Turner fell into the category of individuals he describes, he would still have no constitutional right not to be executed.[13]

---

7. *Id.*

8. *Id.*

9. *Id.*

10. *Id.* (emphasis added).

11. TEX. CODE CRIM. PROC. art. 11.071.

12. *Ex parte Battaglia*, No. WR-71,939-01, 2009 WL 3042925 (Tex. Crim. App. Sept. 23, 2009) (not designated for publication).

13. *Battaglia v. Stephens*, No. 3-09-CV-1904-B, 2013 WL 5570216, at *3 (N.D. Tex. Oct. 9, 2013) (quoting *Turner v. Epps*, 460 Fed.Appx. 322, 328 (5th Cir.) *cert denied*, 565 U.S. 1187, 132 S.Ct. 1306, 181 L.Ed.2d 1035 (2012) (emphasis added) (internal citations omitted)).

The United States District Court for the Northern District of Texas denied relief,[14] the Fifth Circuit affirmed,[15] and the United States Supreme Court denied Battaglia's petition for writ of certiorari.[16]

Battaglia was scheduled for execution on March 30, 2016. On February 19, 2016, he sought appointment of new counsel in state court to investigate and present a claim of incompetency to be executed.[17] This Court denied his request, and the federal district court also denied his request.[18]

However, on the day of Battaglia's scheduled execution, the Fifth Circuit reversed the federal district court's denial of his motion for appointment of counsel and granted his motion for a stay of execution to allow newly appointed counsel time to develop his claim of incompetency to be executed.[19] It is important to note that this decision was not based on the potential merits of Battaglia's claim of execution incompetency, but because the Fifth Circuit agreed that Battaglia's counsel at that time had "abandoned" him with respect to his state competency proceedings.[20] In response to the State's argument that any competency claim would be "meritless," the Fifth Circuit noted that Battaglia "may

return to state court and file an Article 46.05 petition."[21] The Fifth Circuit also found that Battaglia had "presented some evidence of mental illness and delusions,"[22] and that "[a] stay is needed to make Battaglia's right to counsel [to develop such a claim] meaningful."[23]

Battaglia's execution date was reset for December 7, 2016. Battaglia then filed an Article 46.05 motion in state court. Acknowledging that Battaglia made a "substantial showing" of incompetency,[24] the trial court agreed to give him an adequate opportunity to submit evidence and argument from counsel, including expert psychiatric evidence. Two experts—Dr. James Womack and Dr. Thomas Allen—were appointed by the trial court to evaluate Battaglia for execution competency.[25] Battaglia retained Dr. Diane Mosnik and the State retained Dr. Timothy Proctor as experts to evaluate him for execution competency.

An evidentiary hearing to determine execution competency was held on November 14–15, 2016, before Judge Robert Burns, a District Court Judge in Dallas County. Judge Burns found that Battaglia failed to prove by a preponderance of the evidence

14. *Battaglia v. Stephens*, No. 3-09-CV-1904-B, 2013 WL 5570216 (N.D. Tex. 2013).

15. *Battaglia v. Stephens*, 621 Fed.Appx. 781, 782 (5th Cir. 2015) (per curiam).

16. *Battaglia v. Stephens*, —— U.S. ——, 136 S.Ct. 803, 193 L.Ed.2d 725 (2016).

17. TEX. CODE CRIM. PROC. art. 46.05.

18. *Battaglia v. Stephens*, No. 3:16-CV-0687-B, 2016 WL 7852338 (N.D. Tex. Mar. 18, 2016).

19. *Battaglia v. Stephens*, 824 F.3d 470, 475–76 (5th Cir. 2016).

20. *Id.* at 474 ("Whether or not [Battaglia's counsel] *should have* represented Battaglia in state competency proceedings, he *did not* do so. Accordingly, we conclude that [Battaglia's

counsel] 'abandoned' Battaglia for purposes of pursuing a [competency] claim." (emphasis in original)).

21. *Id.*

22. *Id.* at 475.

23. *Id.*

24. *See* TEX. CODE CRIM. PROC. art. 46.05(f) ("If the trial court determines that the defendant has made a substantial showing of incompetency, the court shall order at least two mental health experts to examine the defendant using the standard described by Subsection (h) to determine whether the defendant is incompetent to be executed.").

25. *See id.*

that he is incompetent to be executed.[26] The trial court issued its ruling on November 18, 2016. Battaglia appealed the trial court's ruling to this Court, and we granted a stay of execution to review that ruling.

## DETERMINING COMPETENCY TO BE EXECUTED

### A. Cases Discussing Execution Competency

#### 1. 1986—*Ford v. Wainwright*[27]

In 1986, the Supreme Court decided in *Ford v. Wainwright* that the Eighth Amendment prohibits the State from executing a person who is incompetent. The plurality opinion reasoned that a prisoner is incompetent to be executed when his "mental illness prevents him from comprehending the reasons for the penalty or its implications."[28] Justice Powell's concurring opinion concluded that the Eighth Amendment forbids the execution of "those who are unaware of the punishment they are about to suffer and why they are to suffer it."[29] In *Ford*, the defendant acquired an "increasingly pervasive delusion" that he had become the target of a conspiracy designed to force him to commit suicide.[30] Ford continued to regress into "nearly complete incomprehensibility."[31] The Supreme Court decided that the Eighth Amendment bars executing a prisoner who has "lost his sanity."[32]

#### 2. 2007—*Panetti v. Quarterman*[33]

In 2007, the Supreme Court decided *Panetti v. Quarterman*. *Panetti* clarified that the requisite "awareness" or "comprehension" required by *Ford* was tantamount to a "rational understanding" of the connection between a prisoner's crimes and his execution—a prisoner must rationally, as well as factually, understand that he is going to be put to death and the reason why.[34] Although *Panetti* identified the concept of "rational understanding" as the focus of the competency inquiry, the Supreme Court's opinion does not define the term. *Panetti* explicitly rejected a bare factual-awareness standard, holding that "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it."[35] It is not enough for the prisoner to merely recite the proffered reason for his execution. Instead, *Panetti* tells us we must look at the prisoner's own "concept of reality," particularly as it relates to the relationship between his crime and his execution.[36] The Supreme Court noted that "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that

---

26. Tex. Code Crim. Proc. art. 46.05(k).

27. *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

28. *Id.* at 417, 106 S.Ct. 2595.

29. *Id.* at 422, 106 S.Ct. 2595 (Powell, J., concurring).

30. *Id.* at 402, 106 S.Ct. 2595 (majority opinion).

31. *Id.* at 403, 106 S.Ct. 2595.

32. *Id.* at 406, 106 S.Ct. 2595. Ford was never executed. He died of natural causes at the age of 37 in his death row cell at Florida State Prison.

33. *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

34. *Id.* at 935, 958–59, 127 S.Ct. 2842.

35. *Id.* at 959, 127 S.Ct. 2842.

36. *Id.* at 958–60, 127 S.Ct. 2842.

the punishment can serve no proper purpose."[37]

Significantly, the Supreme Court did not actually rule that Panetti himself was incompetent to be executed as a result of his schizo-affective disorder and accompanying delusions. Instead, it remanded the case to the district court to make that decision,[38] and the district court scheduled a second evidentiary hearing. Defense hired three experts to evaluate Panetti, subjecting him to extensive questioning and testing designed to gauge his mental health and the likelihood of malingering.[39] At the evidentiary hearing, all three defense experts testified that Panetti's cognitive functioning and behavioral patterns were consistent with schizophrenia.[40] The three experts opined that Panetti suffered from a genuine delusion that he was on death row to preach the Gospel and save souls. Two of Panetti's fellow death-row inmates testified that Panetti preached "fire and brimstone" incessantly—often for up to seven hours a day.[41] The State countered with its own two experts, one of whom was the same Dr. Thomas Allen who evaluated Battaglia. Both experts concluded that Panetti was at least partially fabricating his symptoms to thwart their attempts to administer structured examinations designed to detect malingering.[42] One of the State's experts, Dr. Alan Waldman, testified that Panetti "is about as normal as he wants to be at any given time."[43] The State also presented audio recordings of Panetti's conversations with his parents and sister wherein Panetti spoke at a slow, normal pace, and, although he quoted scripture and made religious comments, he did not "rant" or "preach." Panetti did talk at length with his mother about the trial judge and his corruptness and ineptitude regarding Panetti's trial proceedings.

In its 2008 decision, the district court agreed with the defense's experts that "Panetti is seriously mentally ill" and concluded that "it is not seriously disputable that Panetti suffers from paranoid delusions of some type."[44] However, said the district court, it was evident that Panetti demonstrated a "fairly sophisticated understanding of his case," and it appeared that he was exaggerating some of his symptoms to avoid execution.[45] Ultimately, the district court determined that, *despite his mental illness,* Panetti possessed "both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two."[46] The district court recognized that the Supreme Court has made it clear that, "in the Eighth Amendment context, 'insanity' does have a baseline definition: the test for competence to be executed involves not only a prisoner's factual awareness of the crime, the impending execution, and the state's reason for executing the prisoner, but also some degree of 'rational understanding' of the connection between the crime and the punishment."[47]

37. *Id.* at 960, 127 S.Ct. 2842.

38. *Id.* at 956–62, 127 S.Ct. 2842.

39. *Panetti v. Quarterman,* No. A-04-CA-042-SS, 2008 WL 2338498, at *2 (W.D. Tex. Mar. 26, 2008).

40. *Id.* at *19–22.

41. *Id.* at *26.

42. *Id.* at *23–25.

43. *Id.* at *25.

44. *Id.* at *36.

45. *Id.* at *35.

46. *Id.* at *37.

47. *Id.* at *31 (quoting *Panetti,* 551 U.S. at 958, 127 S.Ct. 2842).

Panetti appealed that decision to the Fifth Circuit, and in its 2013 decision, the Fifth Circuit concluded that the district court's ultimate finding of competency to be executed was *not clearly erroneous* "in light of the evidence adduced at Panetti's competency hearing."[48] The Fifth Circuit held that the district court's "careful draw on the experts' conflicting testimony *is entitled to 'great deference' from this Court.*"[49] In addition, said the Fifth Circuit, the telephone recordings of Panetti's conversations with family members "generally corroborate the testimony of the State's experts."[50] It noted that Panetti conversed normally, demonstrated a remarkably sophisticated understanding of his capital case, and attributed his capital conviction to his trial judge's political corruption, not to his delusions about preaching the Gospel.[51] The Fifth Circuit concluded that the district court did not err in determining that Panetti was competent to be executed. The Supreme Court denied Panetti's resulting petition for a writ of certiorari.[52]

Shortly thereafter, the state court set Panetti's execution for December 3, 2014.

Panetti's counsel was not given notice of Panetti's impending execution,[53] and by the time he became aware of it, only a short time remained before the execution date. At that time, Panetti's execution competency had not been evaluated for seven years. Panetti filed a motion for the appointment of counsel and sought authorization for funds to investigate his present incompetency to be executed so that he could have a "meaningful opportunity" to prepare another Article 46.05 motion. This Court denied Panetti relief.[54] He sought a stay of execution, appointment of counsel, and funding for expert assistance in federal court. The Fifth Circuit stayed Panetti's execution.[55] On July 11, 2017, the Fifth Circuit handed down its decision regarding Panetti's claim for the assistance of counsel and funding, holding that Panetti was entitled to "funding for counsel and for experts to assist in preparing his contemplated federal habeas petition."[56] It is significant to *this* opinion that the Fifth Circuit clearly stated that it was not addressing "the merits of Panetti's claim that he is incompetent to be executed—that is for the district court after Panetti has been afforded the opportunity to de-

48. *Panetti v. Stephens*, 727 F.3d 398, 410 (5th Cir. 2013).

49. *Id.* at 411 (emphasis added).

50. *Id.*

51. *Id.* at 411–12.

52. *Panetti v. Stephens*, —— U.S. ——, 135 S.Ct. 47, 190 L.Ed.2d 52 (2014) (mem. op.).

53. In 2014, trial courts were not required to notify a capital defendant or their counsel when the defendant's execution was set, and a "subsequent" execution could be set as early as thirty-one days out from the execution order. Tex. Code Crim. Proc. Ann. art. 43.141(c) (West 2003). The Texas legislature has since changed this law, and now notice of an execu-

tion date must be given to capital defendants. In addition, all executions must be set at least ninety-one days in advance. Act of May 29, 2015, 84th Leg., R.S., ch. 951, 2015 Tex. Sess. Law Serv. 951 (West).

54. *Panetti v. State*, No. AP-77, 2014 WL 6764475 (Tex. Crim. App. Nov. 25, 2014).

55. *See Panetti v. Stephens*, 586 Fed.Appx. 163 (5th Cir. 2014) ("We stay the execution pending further order of the court to allow us to fully consider the late arriving and complex legal questions at issue in this matter." (first citing 28 U.S.C. § 2251(a)(3); and then citing *McFarland v. Scott*, 512 U.S. 849, 858, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994))).

56. *Panetti v. Davis*, 863 F.3d 366, 378 (5th Cir. 2017).

velop his position." [57] The Fifth Circuit did note, however, that "[s]even years have passed since [Panetti] was last adjudged competent," and since then, Panetti has been observed acting in "an irrational and delusional manner," "expressed the belief that Texas has implanted a listening device in his tooth that sends command messages to his brain," is convinced that his TDCJ ID card was displayed on air by CNN anchor Wolf Blitzer, and "claimed to be the father of actress and singer Selena Gomez." [58] Holding that Panetti's claim of execution incompetence needed to be determined "afresh," the Fifth Circuit reversed the federal district court's denial of appointed counsel and expert funding. It also vacated, "as premature," the district court's findings on the merits of Panetti's claim of incompetence to be executed. [59]

### 3. 2009—*Billiot v. Epps* [60]

James Billiot was convicted of capital murder in the deaths of his mother, stepfather, and half-sister and was sentenced to death. He raised a claim of execution incompetency. Six experts testified during his execution competency hearing. The majority of these experts believed Billiot suffered from paranoid schizophrenia, but the trial court found that Billiot was aware of his impending execution and why he was going to be put to death. [61] The Mississippi Supreme Court affirmed the trial court's

decision. [62] The federal district court discussed the standard of how to determine competency to be executed in the wake of *Ford* and *Panetti* and concluded that "the question remains whether the defendant has a rational understanding of his conviction, his impending execution, and the relationship between the two." [63]

The district court, having observed the demeanor of the experts who testified, found all of them to be well qualified, credible, and sincere in their opinions. They all agreed that Billiot suffered from severe chronic schizophrenia accompanied by delusions. However, because their ultimate opinions on Billiot's competency to be executed differed, the court was compelled to credit one set of opinions over the other. To make that decision, the court conducted its own review of Billiot's medical records and considered its own observations of Billiot at the competency hearing. [64] The district court concluded that Billiot did not have a rational understanding that he would be executed; instead, he believed he would be released. The court was convinced that Billiot would go to the execution chamber believing that he would not die, and therefore could not "prepare himself in any spiritual sense for death." [65] The district court held, therefore, that Billiot was incompetent to be executed. [66]

---

**57.** *Id.* As has been noted by other courts, and as we observe herein, execution competency is a "moving target." *See* note 2, *supra.*

**58.** *Id.* at 378

**59.** *Id.* at 378.

**60.** *Billiot v. Epps*, 671 F.Supp.2d 840 (S.D. Miss. 2009).

**61.** *Id.* at 842 (citing *Billiot v. State*, No. 18-761; DP-38, Findings of Fact and Conclusions of Law 39–40 (Cir. Ct. of Harrison Cty., Miss. May 10, 1989)).

**62.** *Billiot v. State*, 655 So.2d 1, 12–15 (Miss. 1995).

**63.** *Billiot v. Epps*, 671 F.Supp.2d 840, 853 (S.D. Miss. 2009).

**64.** *Id.* at 878.

**65.** *Id.* at 882.

**66.** It does not appear that the State appealed this decision.

### 4. 2011—*Wood v. Thaler*[67]

In *Wood v. Thaler,* Wood filed a motion to stay his execution in federal district court alleging that he was incompetent to be executed. The district court granted Wood's motion to stay and authorized him to retain the services of a mental health professional. Wood was evaluated by an expert hired by the defense, Dr. Michael Roman, who concluded that Wood displayed a persecutory delusion regarding his legal situation and was therefore incompetent to be executed. Dr. Roman described Wood's persecutory delusions:

> Mr. Wood states that it is corruption within the system and the existence of a grudge these people hold against him that causes their desire to persecute him. He states that he is unsure about the reasons they would have a grudge but suspects that it is related to the fact that he was never caught for some of the more minor crimes he committed in his youth.
>
> . . . .
>
> . . . . He claims that "he knows for a fact" that the trial judge and district attorney are masons and that only a direct intervention by their brethren (or a sufficiently large and safely delivered bribe) would lead them to be willing to take the risk of exposing their previous wrongdoing in convicting him by reversing his conviction and providing a new trial. This delusion is perhaps the most classic delusional belief that he holds in that it contains both strong paranoid and persecutory features, along with magical thinking.
>
> . . . . Specifically, he believes that the desire for money and power have driven the conspiracy against him. . . .
>
> . . . .
>
> Mr. Wood demonstrates clear evidence of a Delusional Disorder as defined by the DSM-IV-TR. . . . His delusional system is persecutorial in nature and is particularly well formed around his legal situation. . . .
>
> It does not appear that Mr. Wood is capable of rational thinking regarding his sentence and pending execution. He firmly maintains, as he has since his arrest, that he is not guilty of the crimes for which he has been convicted. . . . He firmly states that he believes his execution has no relationship to the death of the victim in the case, but is rather the product of the aforementioned corrupt system. . . . Mr. Wood strongly believes that his inability to raise the money to bribe the judge is the main reason that he will not prevail.[68]

The court in *Wood* noted that Dr. Roman was a neuropsychologist by training and experience, but his work evaluating Wood's competency to stand trial was his first endeavor evaluating an adult criminal defendant. Dr. Roman admitted that, since that time, he has had very little experience dealing with adult criminals.

The State's expert witness, Dr. Mary Alice Conroy, opined that Wood had a personality disorder, but that he was competent to be executed because "[h]e is aware that he is to be executed by the state of Texas, that the execution is imminent, and he possesses an accurate understanding of the reason for his execution."[69] Dr. Conroy testified at the evidentiary hearing that she "saw nothing" in Wood that was delusional because "when he talked to me about his crime, he certainly talked about being innocent but his expla-

---

**67.** *Wood v. Thaler,* 787 F.Supp.2d 458 (W.D. Tex. 2011).

**68.** 787 F.Supp.2d at 466–68.

**69.** *Id.* at 471.

nation was one that we've heard over and over in this courtroom today; I didn't actually pull the trigger, I was not actually in the convenience store; therefore, I should not be convicted of murder and executed." [70] When asked about his belief that "the state of Texas is out to get him," Dr. Conroy said,

> Well, if it's a delusional belief, we have many, many deluded people on death row. And as far as that goes, in maximum security prisons. Because it's very typical for people in those settings, and I worked in a maximum security male institution for many, many years, to say that the state, the federal government are out to get them.... I had never called anyone delusional just because of that single, very common belief.[71]

When asked if it is a delusional belief to believe that the justice system is corrupt or a judge will accept a bribe, Dr. Conroy testified that she would not call it a delusion, but "grabbing at straws" and "rationalizing" his punishment.[72] Dr. Conroy concluded that Wood has a rational understanding of the connection between his crime and his imminent execution, but that "he simply doesn't agree with it." [73] Specifically with regard to the shared belief in a corrupt system, Dr. Conroy concluded that "the connection between whether he thought his judge was corrupt, whether he thought the D.A. was out to get him really doesn't have anything to do with whether he understands that a jury convicted him of murder and that it's for that murder that he is being executed." [74] Dr. Conroy also noted that the idea of

judicial corruption is not unusual among inmates in a maximum security setting, and Wood's profession of a belief in a conspiracy to execute him was "very self-serving and rational in that it excuses [his] criminal conduct." [75] Dr. Conroy drew a distinction between a delusional belief and a self-serving belief.

Dr. Shelia Bailey, a clinical psychologist employed at the TDCJ's mental health unit, interviewed Wood following a suicidal gesture. She testified at his evidentiary hearing that she believed Wood was malingering. She also testified that the "delusions" described to her by Wood focused on the guards Wood claimed were harassing him, and that he "never mentioned the Freemasons or bribing a judge to her." [76] After consulting with a psychiatrist, she updated her findings and changed her diagnosis to take into consideration the culture or group in which Wood resided: "[U]nder the DSM-IV, 'delusions' do not include beliefs that are shared by other members of the person's culture or group." [77] Dr. Bailey concluded that Wood "was not exhibiting true persecutorial beliefs about the guards because he showed no fear of the guards," and Wood's "distrust of the guards reflected the prison inmates' culture and was perfectly normal for those in a correctional setting where they had suffered a loss of personal identity and were subject to arbitrary control and dependency." [78]

Dr. Roman's failure to consider Wood's subculture was key to the court's holding

70. *Id.* at 480.

71. *Id.*

72. *Id.* at 483–84.

73. *Id.* at 484.

74. *Id.*

75. *Id.*

76. *Id.* at 478.

77. *Id.*

78. *Id.*

that Wood had not met his burden to establish his incompetency to be executed:

At no point in his written report or initial testimony before this Court did Dr. Roman make any reference to the fact [Wood] has spent the last decade and a half on Texas' death row, surrounded by a large group of highly litigious, violent, felons convicted of some of the most heinous crimes imaginable. In fact, the absence from Dr. Roman's September, 2009 report of any mention of DSM-IV-TR's directive that cultural and religious background be considered in making a diagnosis of "delusional disorder" is more than merely noticeable; it borders on the deceptive. Dr. Roman's recitation of (and carefully edited quotations from) the relevant portions of the DSM-IV-TR omit any reference to this requirement. Likewise, Dr. Roman made no effort to address [Wood's] culture or subculture when he testified before this Court. Given Dr. Roman's comparatively sparse experience dealing with adults who have been housed in a maximum security setting, perhaps this omission is not surprising. Given the plain language of DSM-IV-TR, however, *this omission from Dr. Roman's written report and testimony before this Court nonetheless greatly diminishes the credibility of Dr. Roman's conclusions.*

As was explained above, Dr. Conroy expressed the opinion, based upon her *considerable experience working as a forensic psychologist with the Federal Bureau of Prisons for more than two decades,* that it was quite common for inmates in maximum security prisons to belief [*sic*] the government was "out to get them" but that such beliefs do not constitute "delusional disorders" within the meaning of the DSM-IV-TR nor do they portend any other psychotic disorder. On the contrary, Dr. Conroy opined, *the wide-spread belief within prison populations that individuals within the state or federal government have conspired to unjustly convict and sentence "innocent" individuals is, for many prison inmates, simply a means of "rationalizing" their current situations.*[79]

The federal court in *Wood* concluded that there was "considerable evidence in the record suggesting [Wood's] assertion of his conspiracy theory is little more than a 'ruse' by [Wood] to avoid his own execution."[80] First, Wood's complaints about a conspiracy between his prosecutor and trial judge were not credible. They were remarkably non-specific. In fact, Dr. Roman admitted during his testimony that Wood's inability to fully elucidate the details of his conspiracy theory made it questionable whether Wood's purported belief system was truly a delusion.[81] These beliefs suspiciously appeared suddenly after the Supreme Court's *Panetti* decision was handed down.[82] There was no evidence that Wood voiced his concerns about there being a conspiracy to convict him of a crime he did not commit and sentence him to death before the Supreme Court issued its opinion in *Panetti*. There was no credible evidence in the record establishing that Wood had ever described to anyone other than Dr. Roman, Dr. Conroy, and Wood's federal habeas counsel his theory that the prosecutor and trial judge conspired to convict and sentence him to death.[83] Moreover, said the court, Dr. Roman's diagnosis

---

79. *Id.* at 495–96 (emphasis added).

80. *Id.* at 488.

81. *Id.* at 489.

82. *Id.* at 499.

83. *Id.*

of Wood's "persecutory delusional disorder" was not credible because (a) he was inconsistent in his reported conclusions about Wood, (b) it was premised upon an erroneous interpretation of what constitutes a delusional disorder, as defined by the DSM-IV-TR, (c) it relied too much on Wood's test responses to a test which had no relevance to a diagnosis of a delusional disorder, (d) it was undermined because of Dr. Roman's scant experience with criminal defendants, and (e) it ignored Wood's culture or subculture (death row).[84] The court in *Wood* found Dr. Conroy's testimony credible because she was experienced dealing with prison inmates.[85] Similarly, the court found Dr. Bailey's testimony credible because it was consistent with more than a decade of Wood's medical and mental health records.[86]

The federal district court in *Wood* concluded that Wood fully understood that he had been convicted of capital murder ·for his role in the shooting of the victim; that Wood fully understood he was going to be put to death for his role in the victim's murder; and that Wood had a rational understanding of the reason for his death sentence and the causal link between his role in the victim's murder and his own impending execution.[87] Thus, said the district court, Wood was competent to be executed.

Wood appealed to the Fifth Circuit, arguing that it was error for the district court to take judicial notice, based on its own judicial knowledge and experience,

that many prisoners profess beliefs of persecution by prosecutors and judges. The Fifth Circuit rejected this argument and affirmed the district court's holding, concluding that "[t]he district court's recognition that Dr. Conroy's findings were consistent, in part, with its own observation that prisoners often profess persecutorial beliefs does not constitute an independent or essential judicial notice of an adjudicative fact; it was instead a legislative fact that was permissible for the court to take into account in its legal-reasoning process." [88]

Wood's petition for writ of certiorari was denied by the United States Supreme Court.[89] Since that time, however, Wood has been granted a stay of execution by this Court on issues unrelated to his claim of execution incompetency. Wood filed an application for writ of habeas corpus pursuant to Article 11.071 [90] containing allegations of false testimony and false scientific evidence. By order dated August 19, 2016, this Court remanded these two claims to the trial court for resolution.[91]

## 5. 2012/2013—*Ferguson v. Secretary, Florida Department of Corrections* [92]

John Ferguson, convicted and sentenced to death for killing eight people, contended that, under the *Panetti* decision, he was mentally incompetent to be executed. For several years, Ferguson was consistently diagnosed by mental health professionals with paranoid schizophrenia. At his state court competency hearing, there was con-

**84.** *Id.* at 499–500.

**85.** *Id.* at 500.

**86.** *Id.*

**87.** *Id.* at 499.

**88.** *Wood v. Stephens,* 619 Fed.Appx. 304, 309 (5th Cir. 2015).

**89.** *Wood v. Stephens,* —— U.S. ——, 136 S.Ct. 1180, 194 L.Ed.2d 198 (2016).

**90.** Tex. Code Crim. Proc. art. 11.071.

**91.** *Ex parte Jeffery Lee Wood,* No. WR-45,500-02 (Tex. Crim. App. 2016).

**92.** *Ferguson v. Sec'y, Flo. Dep't of Corr.,* 716 F.3d 1315 (11th Cir. 2013).

flicting expert testimony.[93] One expert testified that Ferguson exhibited delusional beliefs and experienced hallucinations. He recounted Ferguson telling him that his long-deceased father was still alive and protecting him, that he is the Prince of God, that there is a Communist plot to take over the United States, that he will be resurrected at some point after his execution to sit at the right hand of God, and that he is destined to ascend to his rightful throne and ultimately save the world. That expert concluded that, although Ferguson understands that he is facing execution and that the State of Florida intends to execute him for the crimes for which he was convicted, he lacks a rational understanding of the reason for the execution and its consequences. Another expert concluded that Ferguson was not malingering. Other experts who had evaluated Ferguson testified that Ferguson exhibited no signs of mental illness. Another expert testified that, although Ferguson did believe that he had been anointed the Prince of God and would be resurrected after his death, he still understood the reasons for and consequences of his impending execution. The Florida Supreme Court concluded that, despite Ferguson's documented history of paranoid schizophrenia and genuine delusional belief that he is the Prince of God, the record nonetheless shows that he "understands what is taking place and why." [94]

Ferguson then filed a federal habeas petition claiming that he was mentally incompetent to be executed. The district court affirmed the Florida state court decision.

The competency standard articulated and applied by the Florida Supreme Court is not inconsistent with clearly established federal law, as set forth in *Ford* and *Panetti.* . . . [T]he Supreme Court in *Panetti* generally accepted the proposition that *Ford* . . . was tantamount to a "rational understanding" of the connection between a prisoner's crimes and his execution. What the Supreme Court rejected in *Panetti* was *an overly narrow interpretation* of *Ford* that deems a prisoner's mental illness and delusional beliefs irrelevant to whether he can understand the fact of his pending execution and the reason for it. . . .

Unlike the Fifth Circuit approach rejected in *Panetti,* the Florida Supreme Court neither suggested that Ferguson is competent to be executed merely because he can identify the State's articulated rationale for his punishment, nor did it deem his paranoid schizophrenia and delusional belief that he is the Prince of God to be irrelevant to the issue of competency. To the contrary, the Florida Supreme Court concluded that, *despite Ferguson's mental illness and delusional belief, he nonetheless "understands" the connection between his impending execution and the murders he had committed and understands that he will die when executed.*

. . . .

That the Florida Supreme Court's opinion in this case used the terms "awareness" and "understanding" interchangeably, and often used both terms without the modifier "rational," does not mean that it failed to heed the holding of *Panetti* or rendered a decision inconsistent with that precedent. . . . [95]

---

93. *Ferguson v. State,* 112 So.3d 1154, 1157 (Fla. 2012).

94. *Id.*

95. *Ferguson v. Sec'y, Flo. Dep't of Corr.,* 716 F.3d 1315, 1335–37 (11th Cir. 2013) (emphasis added).

The federal district court also noted that, although there was testimony to support Ferguson's claim of incompetence, "the trial court was not required to find that evidence credible when it was contradicted by the testimony of the State's expert witnesses."[96]

While Ferguson's expert, Dr. Woods, offered a contrary opinion, it was not objectively unreasonable for the state trial court to credit the expert opinions of Drs. Myers and Werner, particularly in light of the undisputed evidence that Ferguson has, for over a decade, adequately functioned in his day-to-day life without the need for antipsychotic medications and without exhibiting any outward manifestations of mental illness or instability to prison officials.

. . . .

Both the reasoning and outcome of the Supreme Court's decision in *Panetti* leave ample room for fair-minded jurists to conclude, as the state courts did here, that Ferguson is mentally competent to be executed despite his mental illness and the presence of a delusional belief.[97]

The United States Supreme Court denied Ferguson's petition for writ of certiorari,[98] and he was executed on August 5, 2013.

### 6. 2013—*Eldridge v. Thaler*[99]

Gerald Cornelius Eldridge is a death row inmate who raised a claim that he was not competent to be executed. He was convicted in 1994 of the murders of his former girlfriend and her daughter. At the evidentiary competency hearing, Eldridge called two expert witnesses, Dr. Pradan Nathan (a psychiatrist who treated Eldridge at TDCJ), and Dr. Michael Roman.

The State called Dr. Thomas Allen and Dr. Mark Moeller.

Dr. Nathan testified that Eldridge expressed delusional beliefs that prison guards were poisoning his food. Dr. Nathan also concluded that Eldridge was not malingering, although he admitted that at least two indicators of malingering, as set forth in the DSM-IV, were present—an antisocial personality disorder and a strong motivation to malinger. It was also brought out that Eldridge's mental health records describe numerous incidents that suggest malingering.

Dr. Roman testified that Eldridge suffered from a psychotic disorder. He said that Eldridge told him that his girlfriend was alive, that he had seen her recently, and that he knew he had been accused of killing her, but that it made no sense to him. Dr. Roman rejected the idea that Eldridge was malingering and instead found that Eldridge was schizophrenic and paranoid and lacked a rational understanding of the connection between his conviction and punishment. Dr. Roman cited to three delusions Eldridge was experiencing: 1) that his victims were alive and that he has had friendly contact with at least one of them; 2) that his food was being poisoned; and 3) that he has traveled outside the prison on a regular basis. Dr. Roman also noted that Eldridge experienced hallucinations and heard voices in his head.

Dr. Mark Moeller testified for the State. Dr. Moeller testified that malingering was the most likely explanation for Eldridge's behavior. He did not believe Eldridge was psychotic or schizophrenic.

---

**96.** *Id.* at 1340.

**97.** *Id.* at 1341 (citations omitted).

**98.** *Ferguson v. Crews,* 570 U.S. 940, 134 S.Ct. 33, —— L.Ed.2d —— (2013).

**99.** *Eldridge v. Thaler,* No. H-05-1847, 2013 WL 416210 (S.D. Tex. Jan. 31, 2013).

Dr. Thomas Allen, who was retained by the State, noted that it was only after Eldridge's arrest that he began reporting hallucinations and delusions. He put great emphasis on the fact that Eldridge's symptoms were mostly self-reported and contained many inconsistencies. Eldridge told Dr. Allen that he understood he was in prison and never claimed that he was wrongly or unjustly imprisoned. Dr. Allen said that he found no pattern of characteristic magical thinking. Dr. Allen concluded that Eldridge had antisocial personality disorder, and he was hostile and paranoid. Dr. Allen believed that Eldridge's reports of delusions were highly questionable and self-serving and inconsistent with genuine mental illness. Dr. Allen concluded that Eldridge was malingering and thus competent to be executed. In comparing Eldridge to Panetti, the federal district court noted as follows:

> Panetti's case for incompetency was significantly more compelling that [sic] Eldridge's. Panetti had a long documented history of mental illness that predated his crime; Eldridge does not. Experts for both sides agreed that Panetti was genuinely and severely mentally ill, though they disagreed as to the extent, severity, and specific diagnosis. In Eldridge's case, the State's experts are of the opinion that Eldridge is not mentally ill, but is feigning his symptoms. Eldridge's expert and his treating psychiatrist disagree but, as noted above, Dr. Roman's opinion is neither credible nor reliable, and Dr. Nathan did not look for evidence of malingering . . . .
>
> . . . .

100. *Id.* at *20–21.

101. *Id.* at *21.

102. *Eldridge v. Davis*, 661 Fed.Appx. 253 (5th Cir. 2016), *cert. denied,* —— U.S. ——, 137 S.Ct. 2215, 198 L.Ed.2d 662 (2017).

The evidence in this case is far less compelling than Panetti's, and in many important ways similar to Wood's [in *Wood v. Thaler*]. Unlike Panetti, Eldridge lacks a record of mental-health problems predating his crime. While he has reported symptoms since his arrest for capital murder, the veracity of his reporting is called into doubt by the inconsistency of his symptoms, the self-serving nature of his complaints, past findings of malingering by this court and suspicions of malingering by treating professional and expert witnesses, and a lack of credible expert testimony in support of his claims. The case law further supports the conclusion that Eldridge has failed to prove by a preponderance of the evidence that he suffers from a delusional disorder, or that he in any way lacks a rational understanding of his execution, the reasons for it, or the connection between the two.[100]

The federal district court concluded that Eldridge was competent to be executed because he rationally understood his crime, his punishment, and the connection between the two.[101] The Fifth Circuit affirmed this decision.[102] It noted that two experts who evaluated Eldridge believed he was malingering, and two concluded that he was not competent to be executed. But, said the Fifth Circuit, "the fact that the expert testimony regarding Eldridge's competency is conflicting is 'probably itself sufficient to sustain the district court's judgment under a clear-error standard.'"[103]

### 7. 2017—*Madison v. Commissioner,*

103. *Id.* at 261 (citing *Panetti v. Stephens*, 727 F.3d 398, 410 (5th Cir. 2013), *subsequently rev'd* 863 F.3d 366 (5th Cir. 2017)).

### Alabama Department of Corrections [104]

Vernon Madison, a death row inmate, sought a stay of execution, arguing that he was mentally incompetent to be executed. The Alabama trial court held a hearing where Madison presented unrebutted testimony from an expert witness that Madison had suffered several strokes that caused vascular dementia and related memory impairments and that, as a result, he had no memory of committing the murder that resulted in his conviction and death sentence. However, the Alabama trial court agreed with the State's expert that, because Madison was able to accurately discuss his legal appeals and legal theories with his attorneys, he had a rational understanding of his sentence and thus was competent to be executed.

Madison filed a federal habeas petition, arguing that the state trial court's decision relied on an unreasonable determination of the facts and an unreasonable application of the law. The federal district court denied relief.[105] Madison appealed to the Eleventh Circuit. Despite the standard of review requiring "great deference" to the state court's and district court's decisions, the Eleventh Circuit held that the record was "wholly insufficient to support the trial court's decision." [106]

As we have discussed, *Panetti* requires a court to examine whether the prisoner, due to a mental disorder, lacks a rational understanding of the connection between his crime and his execution. The only evidence presented to the state court on this question was the testimony and reports of Dr. Kirkland and Dr. Goff. That evidence shows that Mr. Madison suffers from a serious mental disorder that has left him unable to recall his capital offense and that Mr. Madison believes, to the best of his ability, he didn't kill anyone.

First, it is clear that Mr. Madison has a serious mental condition. The experts agreed that Mr. Madison's strokes have impaired his cognitive functioning. Dr. Goff diagnosed Mr. Madison with a vascular neurological disorder (vascular dementia) characterized by retrograde amnesia. Dr. Kirkland did not dispute that diagnosis. The experts agreed there was no indication that Mr. Madison was malingering.

Second, on the record before us it is uncontroverted that, due to his mental condition, Mr. Madison has no memory of his capital offense. Dr. Goff specifically evaluated Mr. Madison's cognitive abilities, including his memory, and found that while Mr. Madison is able to remember certain things from his past, he has no memory of the murder. The State presented no evidence to rebut this finding. Indeed, the record includes no indication that Dr. Kirkland assessed whether Mr. Madison could remember the crime, and the State concedes that Dr. Kirkland never testified on this particular point. . . . Dr. Goff's testimony that Mr. Madison does not remember committing the murder is therefore unrefuted.

Third, the record shows that, as a result of his mental disorder, Mr. Madison does not rationally understand the connection between his crime and his execution. . . . Dr. Goff testified that Mr. Madison cannot remember the crime and doesn't believe he has killed anyone.

**104.** *Madison v. Comm'r, Ala. Dep't of Corr.,* 851 F.3d 1173 (11th Cir. 2017), *petition for cert. filed,* No. 17-193 (Aug. 4, 2017).

**105.** *Madison v. Comm'r, Ala. Dep't of Corr.,* No. 1:16-cv-00191-KD-M, 2016 WL 2732193 (S.D. Ala. May 10, 2016).

**106.** *Madison,* 851 F.3d at 1178.

Dr. Goff therefore concluded that Mr. Madison doesn't understand why he is going to be punished or the act for which he is going to be punished. . . . Dr. Kirkland didn't refute any of Dr. Goff's conclusions. . . .

. . . .

. . . . Dr. Kirkland never testified that Mr. Madison understands that his execution is connected to the murder he committed. . . . [D]ue to his serious mental disorder, Mr. Madison does not understand the connection between his crime and his execution. Dr. Goff's testimony showed that Mr. Madison cannot remember his crime, doesn't believe he committed murder, and therefore cannot rationally connect his crime to his execution.[107]

The Eleventh Circuit noted that Madison "may have been told that he [was] being executed because of the murder he committed," but because Madison had no memory of killing anyone, and because there was no evidence in the record and no finding by the trial court that Madison was malingering, Madison "lack[ed] a rational understanding of the link between his crime and his execution."[108] "A person does not rationally understand his punishment if he is simply blindly accepting what he has been told."[109] The Eleventh Circuit concluded, therefore, that Madison was incompetent to be executed and reversed the federal district court's decision denying relief.[110]

## B. Texas Law On Execution Competency

### 1. Article 46.05

In 1999, the Texas Legislature enacted Texas Code of Criminal Procedure Article 46.05, which prohibits the execution of "[a] person who is incompetent."[111] First, a defendant who has filed a motion under Article 46.05 seeking a stay of execution based on his incompetency to be executed has a threshold burden to make a "substantial showing" of execution incompetency.[112] Once this threshold burden has been satisfied, a defendant is entitled to further proceedings under Article 46.05.[113] This second stage involves an adversarial hearing at which a defendant must establish by a preponderance of the evidence that he is incompetent to be executed.[114] Under Article 46.05(h), a defendant is incompetent to be executed if the defendant does not understand:

(1) that he or she is to be executed and that the execution is imminent; and

(2) the reason he or she is being executed.[115]

If the trial court determines, on the basis of all of the evidence—which includes reports provided by mental health experts who have examined the inmate, any attached documentation, the motion and responsive pleadings, and evidence introduced in the competency hearing—that the defendant has failed to satisfy his burden to show that he is incompetent to be executed, "the court may set an execution date."[116]

107. *Id.* at 1185–87.

108. *Id.* at 1190.

109. *Id.*

110. *Id.*

111. TEX. CODE CRIM. PROC. art. 46.05(a).

112. TEX. CODE CRIM. PROC. art. 46.05(f).

113. *See Mays v. State,* 476 S.W.3d 454, 457 (Tex. Crim. App. 2015).

114. TEX. CODE CRIM. PROC. art. 46.05(k).

115. TEX. CODE CRIM. PROC. art. 46.05(h).

116. TEX. CODE CRIM. PROC. art. 46.05(k).

### 2. *Green v. State* [117]

The Texas Legislature made no relevant changes to Article 46.05 after *Panetti v. Quarterman* was decided in 2007. In 2012, this Court decided *Green v. State*.[118] In that case, Green was convicted of capital murder and sentenced to death. Shortly before his execution, Green applied for a writ of habeas corpus on the ground that he was incompetent to be executed. The trial court held a competency hearing. Green hired Dr. Diane Mosnik to testify for the defense. At that time, Dr. Mosnik had testified "about five times" as a mental-health expert in criminal cases—each time for the defense, and in each case she had concluded that the defendant was incompetent to be executed.[119] Dr. Mosnik concluded that Green was incompetent to be executed because of the various delusions from which he suffered.[120] Green testified at his competency hearing that he believed he was "locked up for no reason," that he was "accused of killing someone that . . . [he] never killed," and that "demons" and other "personalities" lived inside of and controlled him.[121] Green admitted that he understood that he had an execution date set.[122]

The State's only witness in Green's competency hearing was psychiatrist Mark Moeller. He had two meetings with Green and testified that he disagreed with Dr. Mosnik and believed Green to have a rational understanding of the connection between his conviction and his death sentence.[123] Dr. Moeller testified that, although Green was mentally ill, he was competent to be executed because he "clearly understands" that he was convicted for capital murder, and "why he's on death row." [124] The trial court also reviewed records from the mental health professionals at TDCJ concluding that Green suffered from delusions and hallucinations and had been diagnosed as suffering from schizophrenia.[125] This Court noted that the record "contains evidence that would support a finding of competency *or* incompetency." [126] Thus, this Court concluded that Green was competent to be executed because he knew he was convicted of killing the victim, he knew the execution date, and he proclaimed his innocence, "which shows a rational understanding of [his] imminent date and [he knew] the charges that were against [him]." [127]

In *Green*, this Court explained that,

In following *Panetti*, courts have disagreed as to whether it imposed an additional requirement on courts in determining competency, or whether it merely reiterated the established requirements of *Ford*. The latter is the majority view, and we are inclined to agree. Our reading of *Panetti* does not find a mandate regarding how to weigh any particular evidence; instead, we read *Panetti* as instructing that evidence of delusions may not, categorically, be deemed irrelevant. Therefore, we hold that *Panetti* merely clarifies the

---

117. *Green v. State*, 374 S.W.3d 434 (Tex. Crim. App. 2012).

118. *Id.*

119. *Id.* at 437.

120. *Id.*

121. *Id.*

122. *Id.*

123. *Id.*

124. *Id.* at 444.

125. *Id.*

126. *Id.* (emphasis in original).

127. *Id.*

*Ford* standard for determining whether an inmate is competent to be executed. Accordingly, the Code of Criminal Procedure's Article 46.05 standard for reviewing the competency of inmates to be executed, which is a codification of *Ford*, remains constitutionally adequate in the wake of *Panetti*.[128]

Green then filed a federal habeas petition and motion for stay of execution, asserting that he was mentally ill and incompetent to be executed under *Ford* and *Panetti*. Green submitted evidence that he was schizophrenic and delusional, and believed that he was going to be killed as a result of demons conducting spiritual warfare over him.[129] Green submitted affidavit evidence that he showed progressive mental illness, that he stuffed toilet paper in his ears to try to stop the voices in his head, that he had rambling conversations about hearing voices, and that he believed people called "Sapphires" were trying to control his body and make him hurt himself.[130] He submitted the reports of Dr. Mosnik, who concluded that Green was incompetent. The federal district court held that the state court's conclusion that Green was competent to be executed under *Panetti* was incorrect and that Green was not afforded proper due process: "Like Panetti, Green has evidence that he believes the reason for his impending execution is something other than the stated legal justification. The state court's primary reliance on his understanding of the legal justification is unreasonable in light of *Panetti*."[131]

The State filed a motion with the Fifth Circuit to vacate the stay of execution. The State's motion was granted, the district court's order was vacated, and the case was remanded.[132] The Fifth Circuit concluded that Green received the process he was due:

Green had the opportunity to develop his claim in the state proceeding. Green himself testified. The state court provided Green counsel and an expert witness. Green's expert, Dr. Mosnik, produced an expert report. She also testified. Green also submitted over 200 pages of medical records relating to his treatment at the Jester IV unit, records which both experts reviewed....

....

.... The state court allowed Green to retain his own expert. It also considered "all of the exhibits and made the decision based upon a review of all of the evidence including testimony from [Green's] expert." At the competency hearing, the state court made clear that its decision was "based on all the evidence."[133]

Having concluded that the procedures at issue were not constitutionally defective, the Fifth Circuit rejected the district court's holding that the state court made an unreasonable determination of the facts.[134] The Fifth Circuit concluded that *Green had not met his burden of proving his incompetence*:

Although Green identifies medical records from the Jester IV unit that diagnosed him with undifferentiated schizophrenia, these records do not

128. *Id.* at 443 (internal citations omitted).

129. *Green v. Thaler*, No. H-07-827, 2012 WL 4765809, at *4 (S.D. Tex. Oct. 8, 2012).

130. *Id.*

131. *Id.* at *8.

132. *Green v. Thaler*, 699 F.3d 404 (5th Cir. 2012).

133. *Id.* at 413 (internal citations omitted).

134. *Id.* at 414–15.

demonstrate that Green lacked the rational understanding that he was to be executed for Neal's death. Additionally, Dr. Moeller's report shows that Green spent a significant amount of time discussing flaws in his original trial. Dr. Mosnik's report contains additional statements by Green to the effect that the police "set me up," and it evidences his understanding that "[t]hey accused me of killing somebody and they sentenced me to death row but I'm not guilty." Accordingly, the state court's factual competency finding should remain undisturbed.[135]

Finally, the Fifth Circuit believed that the trial court applied the correct standard under *Panetti* in finding Green competent:

After reviewing the state court's bench ruling, we are further persuaded that it applied the correct standard. The court stated:

[F]or the record, I'm going to state that the most compelling evidence of all was from your own expert ... which shows that you know you are to be executed by the State, you know you are convicted of killing the victim ... you know the execution date, and then you proclaimed your innocence which shows a rational understanding of your imminent date and you know the charges that were against you.[136]

This closely follows the requirements laid out in *Ford* and *Panetti* that a prisoner: 1) "know the fact of [his] impending execution and the reason for it," *Ford*, 477 U.S. at 422, 106 S.Ct. 2595 (Powell, J., concurring in part and con-

curring in the judgment), and 2) "[have a] rational understanding of the reason for the execution," *Panetti*, 551 U.S. at 958, 127 S.Ct. 2842. We conclude that the state court applied the correct standard and the district court abused its discretion in finding otherwise. *See Green*, 374 S.W.3d at 443-44 (noting that state court correctly applied Article 46.05).

We arrive at the same conclusion as to the state court's application of the "rational understanding" requirement under *Panetti*.[137]

The United States Supreme Court denied Green's application for stay of execution of sentence of death,[138] and he was executed on October 10, 2012.

### 3. Decisions From This Court Since *Green*

Since *Green*, this Court has handed down only three execution-competency cases discussing the post-*Panetti* standard of review, and none of those three cases involves the exact issue before us today. In *Staley v. State*,[139] this Court reviewed the competency issue, but that question was inextricably intertwined with the issue of whether a defendant can be involuntarily medicated in order to achieve competency, an issue not present in the instant case.

In *Druery v. State*,[140] the trial court found that the defendant had not made a substantial showing of incompetency and refused to appoint experts. There was no formal hearing on the merits to determine if Druery was incompetent to be executed.

---

135. *Id.* at 416.

136. *Id.* at 418 (quoting *Green*, 374 S.W.3d at 437–38) (alterations in the original).

137. *Id.* (quoting *Green*, 374 S.W.3d 434, 443–44 (Tex. Crim. App. 2012)).

138. *Green v. Thaler*, —— U.S. ——, 133 S.Ct. 474, 184 L.Ed.2d 293 (2012).

139. *Staley v. State*, 420 S.W.3d 785 (Tex. Crim. App. 2013).

140. *Druery v. State*, 412 S.W.3d 523 (Tex. Crim. App. 2013).

The case was sent to this Court for a review of the trial court's ruling on that preliminary issue. We held that Druery made a substantial showing of incompetency to be executed and was entitled to further proceedings.[141]

In *Mays v. State*,[142] this Court also reviewed the trial court's decision on the preliminary question of whether the defendant made a substantial showing of incompetence that would trigger the need for further proceedings. The procedural posture of *Druery* and *Mays* is different than the one currently before this Court in which we are charged with reviewing the trial court's substantive decision on the competency issue itself. However, we stated in *Mays* that the *Panetti* standard was incorporated into Article 46.05 by noting that, "with respect to the second prong [of the Article 46.05 test], a defendant does not understand the reason for his execution unless he has a 'rational understanding' of that reason."[143]

### 4. The Current Standard For Execution Incompetence

Even though Article 46.05's standard is still "constitutionally adequate," it is clear in light of *Mays* and in light of *Green* that the statutory language must be interpreted in accordance with and consistent with *Panetti*. This means that the "standard for incompetence in this context which focuses exclusively upon the defendant's awareness of his situation but which ignores the possibility the defendant may suffer from delusional thought processes which interfere with his ability to rationally comprehend the *causal link* between his capital offense and his imminent execution is unconstitutionally narrow."[144] Therefore, "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it."[145] As the Fifth Circuit stated in Green's case, a prisoner is competent to be executed if he "know[s] the fact of [his] impending execution," he knows "the reason for" his impending execution,[146] and he has a "rational understanding of the reason for the execution."[147]

■ Applying all of these guidelines, we hold that a prisoner is competent to be executed under Article 46.05 if he knows he is to be executed by the State, he knows the reason he is to be executed, he knows that the execution is imminent, and, despite any delusional beliefs or other mental illness he may have, and despite the fact that he may deny having committed the capital offense, he comprehends that there is a "causal link" between his capital offense and his imminent execution, beyond merely identifying the State's articulated rationale for the execution.

### BATTAGLIA'S ARTICLE 46.05 MOTION

In this case, the trial court judge found, based on the evidence, that Battaglia understands that he is going to be executed

---

141. *Id.* at 526. It appears at this time that the State is no longer contesting Druery's claim that he is incompetent to be executed.

142. *Mays v. State*, 476 S.W.3d 454 (Tex. Crim. App. 2015).

143. *Id.* at 457, n.4.

144. *Wood v. Quarterman*, 572 F.Supp.2d 814, 818 (W.D. Tex. 2008) (emphasis added) (citing *Panetti v. Quarterman*, 127 S.Ct. at 2861).

145. *Panetti*, 127 S.Ct. at 2862.

146. *See Green v. Thaler*, 699 F.3d at 418 (citing *Ford*, 477 U.S. at 422, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in the judgment)).

147. *Id.* (citing *Panetti*, 551 U.S. at 958, 127 S.Ct. 2842).

and that his execution is imminent. He also found that Battaglia has a rational understanding of the reason for his execution. In determining that Battaglia is competent to be executed, the trial court used the correct standard under Article 46.05 that meets the constitutional standards set out in *Ford* and *Panetti*.[148] We now examine the record to determine whether the trial court abused its discretion.[149]

When considering execution competency, Article 46.05(k) dictates that the trial court shall consider the motion, any attached documents, any responsive pleadings, reports of medical experts, and evidence introduced at the competency hearing. In coming to its conclusion regarding Battaglia's competency to be executed, the trial court was presented with and considered the following evidence:

1. Battaglia's 46.05 motions;
2. Reports and testimony from the four mental health experts who examined Battaglia to determine his competency to be executed;
3. Records of Battaglia's incarceration on death row ("TDCJ records");
4. Records of Battaglia's incarceration at the Dallas County Jail prior to the competency hearing;
5. Pretrial interview of Battaglia by former WFAA reporter Cynthia Vega;
6. Excerpt of 2014 interview of Battaglia by Dallas Morning News reporter Sarah Mervosh;
7. March 2016 interview of Battaglia by documentarian Thomas Leader;
8. August 2016 interview of Battaglia by a reporter from WFAA news;
9. Recordings of jail calls made by Battaglia while incarcerated at the Dallas County Jail prior to the competency hearing;
10. Battaglia's *pro se* filings in federal court;
11. Lay witness testimony offered at the competency hearing;
12. All other evidence and testimony offered at the competency hearing;
13. The argument of counsel; and
14. The transcript of Battaglia's capital murder trial.

The court also stated in its findings that it reviewed the pertinent provisions from Article 46.05 and the applicable state and federal case law.

In his Motion for Ruling of Execution Incompetency, Battaglia emphasized the opinions of three out of the four experts who evaluated him. He asserted that Dr. Diane Mosnik (defense's expert), Dr. Timothy Proctor (State's expert), and Dr. Thomas Allen (court-appointed expert) all concluded that Battaglia suffers from Delusional Disorder and, as a result, he is incompetent to be executed because he does not have a rational understanding of the reason for his execution. Battaglia also emphasized that these three experts found no evidence of malingering.

The State responded to Battaglia's arguments by asserting that the evidence supports the fourth expert witness's (Dr. James Womack's) opinion that Battaglia is competent to be executed. The State argues that the evidence shows that Battaglia had a personality disorder long before committing the offense, but he does not have a mental illness and has not exhibited signs of having a mental illness during the fourteen-plus years on death row. The State claims that the trial court did not err

---

**148.** *See Green*, 374 S.W.3d at 443–44.

**149.** *Id.* at 441–42.

in finding Battaglia a malingerer, not credible, and hence, competent to be executed.

## THE EVIDENTIARY HEARING TO DETERMINE COMPETENCY

The trial court held an evidentiary hearing to determine Battaglia's execution competency. Only one non-expert testified at Battaglia's competency hearing—Shirley Griffin, the library supervisor at the Polunsky Unit at TDCJ. The other four witnesses were the four experts who had evaluated Battaglia for execution competency—Dr. Diane Mosnik (hired by the defense), Dr. Timothy Proctor (hired by the State), Dr. Thomas Allen (court-appointed), and Dr. James Womack (court-appointed).

### A. Shirley Griffin

Shirley Griffin is the library supervisor at the Polunsky Unit at TDCJ, which is the maximum security unit housing the death row inmates. Ms. Griffin has been employed with TDCJ for 19 years. For two of those 19 years she was a correctional officer assigned to death row. Ms. Griffin testified that she knew Battaglia from her time as a correctional officer, law library officer, and then as the law library supervisor. She saw Battaglia possibly three days a week as the law library officer. She testified that, on many occasions, she would receive and fill requests for legal materials for Battaglia. Through Ms. Griffin's testimony, the State showed that Battaglia requested and received, on March 18, 2016, (which was 12 days before his first-scheduled execution), the following cases pertaining to execution competency: *Panetti v. Quarterman*,[150] *Wood v. Quarterman*,[151] and *Mays v. State*,[152] all discussed in detail above.

### B. Dr. Diane M. Mosnik, Ph.D

Dr. Mosnik is a clinical neuro-psychologist. She was hired by the defense to evaluate Battaglia and render her opinion as to his competency to be executed. Dr. Mosnik stated that she is currently in private practice, which is comprised essentially of diagnostic assessments of neurologic and psychiatric conditions. She also stated that she has served as an expert witness for federal and state court criminal proceedings, and has been hired by the defense on forensic cases. She testified that she has evaluated over 50 defendants for competency to be executed. According to the list of presentations given by Dr. Mosnik, as shown on her Curriculum Vitae, much of her expertise lies in the field of Dementia and Alzheimer's Disease. Moreover, she has extensive publications on neuropsychology, specifically including schizophrenia.

In her written report, Dr. Mosnik opined that Battaglia believes he is innocent and discusses his innocence as part of a complex delusional cover-up scheme—Battaglia believes he is being executed "for the purpose of preventing him from disclosing [others'] illegal behavior and machinations." She concluded that Battaglia suffers from Bipolar Disorder and Delusional Disorder and, as a result, he does not have the capacity to rationally understand the connection between his crime and his punishment, and, as such is not competent to be executed at this time.

At the evidentiary hearing, Dr. Mosnik confirmed that, before she saw Battaglia in person she reviewed "a voluminous amount of records"—some prior psychological examinations; the TDCJ Health Archives; interviews; and correspondence regarding

**150.** 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

**151.** 572 F.Supp.2d 814 (W.D. Tex. 2008).

**152.** 476 S.W.3d 454 (Tex. Crim. App. 2015).

letters that were written by Battaglia to both attorneys and the courts. Dr. Mosnik testified that Battaglia's test scores showed "no indication of malingering or feigning on the M-FAST scale," and no indication of malingering on the SIMS (Structured Interview for Malingered Symptomatology) test. The other personality tests she administered also resulted in no significant indication of malingering or feigning. She concluded that she does "not believe that he is faking it," and she does not believe an intelligent person could fake the malingering tests.

Dr. Mosnik admitted at the hearing that Battaglia "is aware that he has an execution date scheduled and is scheduled to be executed," and that he is aware that he is going to be executed because he was convicted for having murdered his daughters. However, she continued to maintain that Battaglia does not have a rational understanding of the connection between himself doing the crime that he was convicted of and his impending execution. Rather, she said, he believes that he is being executed to quiet him from releasing information that can indict or get other people in trouble—information about "inappropriate sexual liaisons occurring between attorneys and judges and prosecutors, the DA's office."

## C. Dr. Timothy J. Proctor, Ph.D.

Dr. Proctor, a licensed psychologist who is board certified in forensic psychology, was hired by the State to evaluate Battaglia for execution competency. Over the course of eight hours, Dr. Proctor conducted a clinical interview, a mental status evaluation, behavioral observation, and psychological testing. Dr. Proctor also reviewed all of Battaglia's medical and psychological records, court documents, test results, the trial record, audio/video interviews of Battaglia, and the other experts'

reports. In his written report, Dr. Proctor opined that Battaglia did not appear to be malingering. Dr. Proctor concluded that Battaglia's beliefs "appear to be the product of a vast and complicated delusional system." Unlike Dr. Mosnik, however, Dr. Proctor admitted, as noted by the trial court in its findings, that it is possible for an intelligent person to "feign delusions." Dr. Proctor concluded in his written report that Battaglia was "presently incompetent for execution because, although he is aware of the State's rationale for his execution, he does not have a rational understanding of such."

Dr. Proctor testified consistently with his written report, noting that Battaglia described having conspiracy-based delusions involving cover-ups, tax fraud, prostitution, child molestation, drug use, money laundering, and misconduct among attorneys and judges. Battaglia also told Dr. Proctor that he had doubts that he was at his apartment on the night his daughters were killed. He does not recall doing it, and if he did do it, he believes it was because someone drugged him and forced him into doing it. Nevertheless, Dr. Proctor concluded that Battaglia knows he is currently set for execution; he knows the execution is imminent, and he knows the reason that the State is saying he will be executed—because he was convicted of capital murder for shooting his two daughters. But, said Dr. Proctor, because of the conspiracy that Battaglia was talking about, Battaglia does not have a rational understanding of why he is being executed.

## D. Dr. Thomas G. Allen, Ph.D

Dr. Allen was one of the two experts appointed by the trial court to evaluate Battaglia for execution competency. According to Dr. Allen's Curriculum Vitae, he attained his Ph.D in psychology in 1984, and he has been practicing "forensic psy-

chology since 1987 in Texas District Courts." He is in private practice as the Director of Clinical Services at the University Park Hospital in Tyler, Texas. He saw Battaglia on two occasions for two hours each time. He also reviewed video interviews of Battaglia, court filings, jail mail, letters, Battaglia's mental health, jail, and TDCJ records, and testing results.

Dr. Allen's written report noted that Battaglia had no psychiatric admissions prior to or subsequent to his capital murder trial; that he is not on any psychotropic medications; and he was determined to be competent to stand trial. Dr. Allen observed that Battaglia probably functioned in the bright-normal to superior range of intelligence; that he is very well-read; and that he did not exhibit any signs of Schizophrenia or Bipolar Disorder, despite having been diagnosed with Bipolar Disorder in the past. Dr. Allen noted that Battaglia talked about a complex delusional system involving conspiracies and exhibiting extreme homophobia. "His delusions included a complex web of plots against him by the legal system to include judges and attorneys, and the web included homosexual attorneys, judges and prosecutors in collusion to deprive him of his legal rights and to kill him." Dr. Allen observed that Battaglia ranted about his ex-wives and their conspiracy with the "homosexual legal community." The conspiracy against him also involved "child molesters" and drug-using attorneys, and prosecutors. He was very accusatory about both ex-wives indicating not only homosexual affairs but a high level of promiscuity. He referred to them as "bitches," "cunts," and "whores" who were out to get him, ruin his life, and have him killed. Dr. Allen noted that Battaglia had a history of problems with impulse control whenever he was frustrated with his ex-wives. Moreover, in his written report, Dr. Allen stated that "an important indicator of malingering is melodramatic presentation that typically involves claims of hallucinations, delusions and a variety of nonsensical symptoms that appear to be no more than a caricature of genuine mental illness." While he believed Battaglia to be dramatic, he said Battaglia was not *melodramatic* in his recitation that his trial was a "sham" and the jury was "blood thirsty" and "rigged" by the judge, the prosecutor, and his defense counsel. Again, however, Dr. Allen noted in his report that Battaglia is currently aware that he was convicted of Capital Murder, and that his execution is imminent; "[H]e clearly stated 'in a month I'll be dead or still fighting this' and this examiner took the statement to indicate he was aware of the execution and its imminence." But, Dr. Allen believed that Battaglia's complex delusional system appears to be impairing a rational understanding of the reason for the execution.

Dr. Allen testified at the evidentiary hearing. He reiterated that Battaglia is aware that he was convicted of murdering his children and that he was sentenced to death and his execution is imminent, but he is convinced that his trial and conviction were a sham. Dr. Allen admitted that most defendants maintain that the system is "rigged" and that they are innocent. Dr. Allen also testified that Battaglia told him he was drugged; that he did not recall the murders; that this was all a conspiracy; and that his daughters may not even be dead. Dr. Allen observed that Battaglia believed that his ex-wives, the prosecutors, the defense attorneys, and the judges have all conspired against him to prevent him from proving his innocence, and that the conspiracy involves the KKK, child molesters, and homosexual lawyers.

On the other hand, Dr. Allen expressed his "concerns and skepticism" that, over the last 14 ½ years, the TDCJ records did not reflect any "psych referrals." He said

that "every mental status report that [he] looked at showed normal limits."

[F]unctioning, he's not complaining to anybody in the prison system about any of these delusions that I could find. And you would think that if he were that severely delusional, surely he would be having psych visits. And he told me he's not crazy. He said TDC told him he wasn't crazy, didn't need any medications. And no psych referrals, that kind of bothers me. And I find it inconsistent with what my interview was giving me, especially in the past because past doctors and testing showed that they opined that he suffered from bipolar disorder. None of that is documented in TDCJ records after 14 and a half years, and I didn't see any of those symptoms when I saw him. He was jovial and not complaining of depression or suicide or anything.

Dr. Allen also seemed to waver on whether Battaglia was malingering. He said that he cannot prove that Battaglia is *not* malingering, but he also cannot prove that Battaglia *is* malingering. Dr. Allen stated that Battaglia "knows why he's being executed, the imminence of the execution," and that Battaglia knows "why he's sentenced to be executed. He knows what he did. He can define capital punishment." Dr. Allen believes that Battaglia "knows he's the murderer."

In fact, Dr. Allen admitted on cross-examination that, after reading more records, he was changing his conclusion to one that was not as certain as before. After finding no "sign of mental illness or anything in the TDCJ records," Dr. Allen could only conclude that Battaglia "may" not have a rational understanding of why he is being executed.

Moreover, when questioned about his opinion regarding Battaglia having read the *Panetti* case while on death row, Dr. Allen said that, knowing Battaglia had read the *Panetti* case "would give you pause.... And we're dealing with someone who's reading high-level material, Heidegger and Buddhism. In addition to that, you know, if he can digest things like *Panetti*, you have to wonder the extent to which he's styling his presentation, let's say, in terms of his negative response bias."

### E. Dr. James Womack, Ph.D.

Dr. Womack was the fourth expert to testify. He was appointed by the court to evaluate Battaglia. Dr. Womack is a licensed psychologist specializing in criminal forensics. He has a Ph.D. in Counseling Educational Psychology from the University of Mississippi, and he worked for the Federal Bureau of Prisons for 21 years evaluating inmates for competency to stand trial and/or mental state at the time of the alleged offense. Unlike the other three experts, Dr. Womack is the only psychologist whose practice has been almost exclusively in forensic psychology.

He interviewed Battaglia on two separate occasions, and, although Dr. Womack did not conduct his own testing, he reviewed court documents and medical records, jail mail, and the testing done by the other experts. In the first of two written Psychological Evaluation reports, Dr. Womack concluded as follows:

It is opined Mr. Battaglia is competent to be executed, per Texas Code of Criminal Procedure (TCCP), Article 46.05(h)(1)(2). This is based upon the evidence he understands that he is to be executed, that the execution is imminent, and the reason he is being executed. Historical comments by Mr. Battaglia show he had long understood the criteria for competence to executed [*sic*], and his interview comments illustrate he under-

stood them all at the time of this assessment.

In several of Mr. Battaglia's letters from jail he makes comments supporting the opinion he understood he is to be executed and that it was imminent.... During a March 16, 2016, interview with the news media, Mr. Battaglia acknowledged he was in jail for, as he put it, "Charge is capital murder ... for my two daughters Faith and Liberty in 2001." At the end of that interview he spoke of apparent physical life and life after death, when he stated; "One existence and other is just transitioned. Won't be missing something too much, because if I exist now and later, I always exist." He later said, "Of all the possibilities it's (death sentence) not that bad."

During a recorded interview with an unidentified individual in the media on August 16, 2016, Mr. Battaglia demonstrated awareness he is to be executed. He asserted his "adversaries" [were] "causing the deaths of Faith and Liberty;" however, he did not explain how they were killed or by whom.

In two recorded interviews with "Cynthia," (name on the DVD provided) both of which are undated, Mr. Battaglia voiced knowledge of two of the three elements to be considered competent to be executed.

In the examiner's interview with Mr. Battaglia he provided clear examples he understands the fact the State intends to execute him and it seeks to do so imminently. He acknowledged he had been convicted of murdering his two daughters but denied having done so. He demonstrated his knowledge the state intends to carry out the execution imminently when he said the execution date is December 7, 2016. At no time did he express any confusion as to these two points. When asked if another party

had, in fact, murdered his daughters, would this fact justify that party executed, he stated, "Technically yes." This answer reflects his knowledge the State has the legal right to carry out the punishment for the conviction of Capital Murder.

Dr. Womack was asked to further evaluate Battaglia since there was such disparity between Battaglia's emotional presentation during his assessment of Battaglia and his emotional presentation with the other three experts. In his second written Psychological Evaluation report, Dr. Womack opined that Battaglia does *not* have a delusional disorder.

Mr. Battaglia vacillated in his assertions of his innocence, ultimately providing statements that are viewed as inconsistent with a fixed delusion. He also provided inconsistent accounts of certain events and his recall of events. For example, regarding the latter, Dr. Allen indicated Mr. Battaglia holds the delusion his daughters are not dead; however, Mr. Battaglia clearly noted they are deceased when talking to this writer, which is also supported by other sources.... He informed this writer, "I didn't know they had died until day after [my arrest]." ... He indicated he was arrested after departing the tattoo parlor. He also claimed he did not know something important about the deaths of his children. When asked what the record indicates were the approximate times of his girls' deaths, he stated, "Oh God, I guess in the evening, ... I didn't focus on it because I knew I didn't have anything to do with it." This is a very odd assertion for one who expressed great detail about seemingly important life events, especially about being a victim.

... This writer is of the opinion Mr. Battaglia made statements to both Dr.

Proctor and this writer believed to be inconsistent with that of a delusional disorder. Dr. Proctor's report notes, "He said that at present he does not believe it was him who did it, and that if he did it was the result of others, such as ex-wives, drugging him against his will." During the second interview between Mr. Battaglia and this writer he was asked how he thought his daughter's deaths were caused, and he stated, "I have a problem with it because I don't know;" however, later he said, "I don't know what happened or, [if I was there,] I was drugged because I was not there physically or, [if there physically not] mentally." This assertion is questionable because he first insists he was not present and then provides a possible exculpatory explanation for why he might have been present, even though his depiction of the day of their murders is seemingly inconsistent with being drugged, and he expressed no rationale for how he could have been drugged. The point is, if he holds a delusional idea of what happened, he most likely would maintain his position he was not present at the time of the murders and argue any evidence to the contrary would have been fabricated, and not offer an exculpatory reason for possibly being present during the murders.

In the second interview Mr. Battaglia seemingly resisted demonstrating his knowledge the State intends to execute him due to the fact he has been convicted of specifically murdering his two girls, even though recent records reflect such knowledge. Recall his March 16, 2016, news interview whereupon he stated, "Charge is capital murder … for my two daughters Faith and Liberty in 2001." When that element of TCCP Article 46.05 was broached with him he knew the first two elements; however,

he would say he was being executed only because of the conspiracy against him. While this writer agrees with the assertion that many delusional individuals are resistant to admitting they have mental health problem, if one wanted to simulate a presentation of a delusional disorder one could deny mental illness while asserting highly suspicious claims. It has been suggested Mr. Battaglia likely could not fabricate such an elaborate system of various antagonists and maintain it over the years; however, he is a highly intelligent person who has had the time and motivation to begin creating a complex, paranoid story line that he could have practiced over the years. He also has made exculpatory comments independent of seeming delusional ideas; therefore, this writer is of the opinion he is likely not to have a delusional disorder.

When Dr. Womack testified at the competency hearing, he explained that,

By virtue of the fact that there was no imbalanced mood, no labile mood, you know, switching of moods rapidly, by virtue of the fact that this thinking was highly organized and coherent and easy to follow, it was my opinion that the information he was providing me and his understanding of what he was being asked greatly supported the presence of being competent to understand the Texas Code of Criminal Procedure [46.05].

Dr. Womack confirmed that Battaglia is aware that he is about to be executed; he knows his execution date; and there is no indication of distorted thinking that is preventing him from understanding that he is about to be executed because he murdered his daughters. Rather, said Dr. Womack, Battaglia's allegations of a conspiracy are common:

No, I—I did not think at that time that there was evidence of delusional disor-

der. It sounded more like to me—and common and in my prior work setting—irritable complaints, denunciations of the system and parties in the system, and there was no emotion or affect connected to those comments. He·didn't become irritable or overtly angry. And he easily dropped the topic and continued on addressing other things. And I just found that inconsistent in my experience with people with prominent delusional—or full criteria for a delusional disorder—and so I did not believe it was present.

When he testified at the competency hearing, Dr. Womack noted that, "for the first time, at the end of the second interview," Battaglia demonstrated acute irritability and demonstrable anger and increased speech about the legal system, his medical treatment, and the unavailability of reading materials. Dr. Womack also pointed out that neither he, Dr. Proctor, nor Dr. Allen saw any symptoms of mania depression or bipolar disorder. Dr. Womack agreed that, "consistent with one of the other examiners," he believed that Battaglia "likely has a personality disorder that's comprised of multiple features." He agreed with Dr. Proctor that Battaglia suffers from ·narcissistic and antisocial features.

But Dr. Womack·found it "very problematic" that Battaglia's "sudden insight" into his "disorder" "emerge[d] out of seemingly a lack of treatment." Furthermore, Dr. Womack said that he had asked Battaglia why the subject of his competency to be executed was raised in the first place, and Battaglia said, "Because in the writ, I was putting forth claims. I can't be competent because I don't understand the con-

nection between the first and second part. Think my charge of cover-up prevents me from understanding why being · killed [sic]." Dr. Womack ultimately concluded that Battaglia is intelligent and sophisticated enough to be able to fake the tests such that an examiner would believe that he has a delusional disorder or some other mental illness. He also testified that if Battaglia had been reading case law that deals with competency, that could provide information for him to fake delusional disorder symptoms when interviewed by a mental health expert. It was Dr. Womack's ultimate conclusion that Battaglia does have a rational understanding of why he is going to be executed.

## THE TRIAL COURT'S FINDINGS AND CONCLUSIONS REGARDING COMPETENCY TO BE EXECUTED

### A. The Standard of Review

The trial judge, citing to Article 46.05, concluded that Battaglia understands he is going to be executed, he understands that his execution is imminent, and he understands the reason for his execution.[153] Citing to *Mays* and *Panetti*, the trial court concluded that Battaglia has a rational understanding of the reason for his execution.[154] As in *Green*, we find that the trial judge correctly articulated the Article 46.05 standard, "which meets the constitutional standards determined by the Supreme Court's opinions in *Ford* and *Panetti*."[155] The key is whether the trial court abused its discretion in applying Article 46.05 to the facts presented.

153. TEX. CODE CRIM. PROC. art. 46.05(h).

154. *Mays v. State*, 476 S.W.3d 454, 457 n.4 (Tex. Crim. App. 2015) (citing *Panetti*, 551 U.S. at 959, 127 S.Ct. 2842).

155. *Green*, 374 S.W.3d at 443–44.

■ Under Article 46.05(k), Battaglia has the burden to establish "by a preponderance of the evidence" that he is incompetent to be executed. Preponderance of the evidence is defined as "the greater weight of credible evidence that would create a reasonable belief in the truth of the claim." [156]

■ We have held that appellate review of a trial court's determination of execution competency "necessitate[s] a highly deferential standard of review." [157]

[T]he appropriate standard to review a trial court's finding of a defendant's competency to be executed is whether the trial court abused its discretion. We shall reverse the judgment only if it is outside the zone of reasonable disagreement. We shall sustain the trial court's ruling if it is supported by the record and is correct on any theory of law applicable to the case.[158]

In this case, the trial court conducted an evidentiary hearing with live testimony. The trial court's decision took into account all of the evidence presented. Its determination was made after weighing the live testimony as it related to the documentary,

video, and audio recorded evidence.[159] Therefore, we will give almost total deference to the trial court's assessment of *all* of the evidence presented (including the documents, the video and the audio recordings), since all of the evidence pertaining to the competency issue is intertwined—the documentary evidence and recordings factored into the expert opinions, and all of the evidence factored into the trial court's decision.

## B. The Trial Court's Disregard of Dr. Mosnik's Testimony

■ Although the trial court acknowledged during the hearing that Dr. Mosnik was a "qualified forensic psychologist," it found her not credible and disregarded her testimony in its entirety because 1) she had "no experience" working with a prison population, 2) she has "very limited criminal experience of any kind," and 3) when she has testified in a criminal case it has only been for the defense. We do not fully agree with the trial court's stated observations that Dr. Mosnik has "very limited" criminal experience and "no experience" working with a prison population.[160] Never-

156. *See Druery v. State,* 412 S.W.3d 523, 540 (Tex. Crim. App. 2013) (citing *Rickels v. State,* 202 S.W.3d 759, 763–64 (Tex. Crim. App. 2006)).

157. *Green,* 374 S.W.3d at 441.

158. *Id.* at 441–42.

159. *Mays v. State,* 476 S.W.3d 454, 458–59 (Tex. Crim. App. 2015) ("When dealing with issues of historical fact, reviewing courts must determine whether the evidence, when viewed in the light most favorable to the court's ruling supports the finding of fact.... The reason that reviewing courts defer to the trial court's factual determinations is precisely because the judge is 'Johnny-on-the-spot,' personally able to see and hear the witness testify.... [W]e have said that when a mixed question turns on credibility and demeanor, a deferential standard still applies.... [A] ques-

tion turns on credibility and demeanor when the testimony of one or more witnesses, if believed is *always* enough to add up to what is needed to decide the substantive issue." (internal citations and quotations omitted)); *see also State v. Duran,* 396 S.W.3d 563, 570–71 (Tex. Crim. App. 2013) (noting that the deferential standard of review applies to a trial court's determination of historical facts even when that determination is based on a videotape recording admitted into evidence); *Manzi v. State,* 88 S.W.3d 240, 243 (Tex. Crim. App. 2002) (explaining that a deferential standard of review applies to a trial court's determination of historical facts when that determination is based solely upon affidavits).

160. In the case of *Druery v. State,* 412 S.W.3d 523 (Tex. Crim. App. 2013), this Court recognized Dr. Mosnik's qualifications as "a mental

theless, we agree with the trial court that Dr. Mosnik's forensic experience is limited, as her concentrated specialty is in clinical neuropsychology. Additionally, Dr. Mosnik has never testified in support of the State's position regarding execution competency.

With regard to the substance of Dr. Mosnik's opinion, she was somewhat vague in her description of Battaglia's persecutorial delusions. In her report, she described his mental illness using only conclusory, non-specific observations. Battaglia told Dr. Mosnik that he is innocent, and that there is a "cover-up" to prevent him from exposing those who are corrupt. But his delusions, *all self-reported*, are not described with any type of specificity. The lack of specificity related to Battaglia's so-called persecutory delusions, and the fact that his symptoms of having a delusional disorder are all self-reported, weigh against finding them true.[161]

█ Generally speaking, a trial court is within its authority to accept the medical evidence that it believes is most credible and convincing and reject that which it finds not credible.[162] We hold that the trial court's decision to disregard Dr. Mosnik's expert opinion was not an abuse of its discretion.

## C. The Trial Court's Assessment of Dr. Proctor's Testimony

█ Although Dr. Proctor concluded that Battaglia is not malingering, the trial court found it significant that Dr. Proctor admitted that Battaglia "has what most would consider the highest possible incen-

tive to malinger (i.e., to avoid death)." Dr. Proctor testified that Battaglia's awareness—that ultimately finding him incompetent to be executed could result in a stay of his upcoming execution date—could have a "major" impact on Dr. Proctor's evaluation:

[I]t's a major piece of an evaluation like this. Certainly any forensic evaluation, a major piece is looking at the possibility that someone is intentionally or even, you know, unconsciously not being fully up front with you. And so when you have such a high-stake matter where death is an issue, you're particularly aware and concerned about, you know, being skeptical, considering the possibility that someone might be trying to manipulate how they are presented.

Moreover, the trial court found it significant that Dr. Proctor believed Battaglia does have the intellectual capacity to malinger. The trial court agreed with Dr. Proctor's conclusion that Battaglia "understands that he is to be executed and that the execution is imminent, and further, he understands the reason he is to be executed." The trial court also agreed with Dr. Proctor's opinion that Battaglia is intelligent enough to fake his symptoms of persecutory delusions. Both of these conclusions are supported by the record and both support the trial court's ultimate conclusion that Battaglia is competent to be executed.

Despite Dr. Proctor's testimony that he has evaluated "thousands" of defendants in criminal cases, the trial court's observations that Dr. Proctor has "limited experi-

---

health expert." In *Aldridge v. Thaler,* 2010 WL 1050335 (S.D. Tex. 2010), Dr. Mosnik evaluated the defendant to determine competency to stand trial. She rendered her expert opinion that the defendant was not competent to stand trial. The federal district court agreed with Dr. Mosnik that Aldridge was incompetent to stand trial.

161. *See, e.g., Wood v. Thaler,* 787 F.Supp.2d 458, 488 (W.D. Tex. 2011).

162. *See, e.g., Graham v. State,* 566 S.W.2d 941, 950–51 (Tex. Crim. App. 1978) (acknowledging that the trier of fact is free to disregard expert testimony).

ence" working in a prison or jail, and that he has no experience working inside of a penitentiary, are supported by the record. Moreover, the trial court did not find credible Dr. Proctor's conclusion that Battaglia's self-reported belief in the complicated conspiracy against him prevented him from having a *rational* understanding of the reason for his execution. The trial court had the discretion to assess the credibility and opinion of Dr. Proctor. Since there is evidence in the record that Battaglia is malingering and that he does have a rational understanding of the reason for his execution, we conclude that the trial court's disregard of Dr. Proctor's conclusion that Battaglia is incompetent to be executed was not outside the zone of reasonable disagreement.

### D. The Trial Court's Decision to Not Rely on the Opinions of Dr. Mosnik, Dr. Proctor, and Dr. Allen Because "They Applied an Incorrect Legal Standard When Applying *Panetti*" and "Ignored" the Correct Criteria Set Out in *Wood v. Thaler*

The trial court concluded that Drs. Mosnik, Proctor, and Allen "ignored the DSM criteria that the delusional beliefs exhibited by that person are not normally accepted by other members of the person's subculture." Citing to *Wood v. Thaler*,[163] the trial court stated in its findings that, "since claims of wrongful prosecution and conspiracies by judges, witnesses, prosecutors, and defense attorneys are common and normally accepted within a prison subculture, that belief by Battaglia is not a 'delusion.'"

When we compare the evidence in *Wood* with the evidence before the trial court in this case, we find the following significant similarities between Wood and Battaglia. First, both trial courts found the defendants—Wood and Battaglia—to be malingering. In this case, the trial court found that Battaglia is "vengeful, manipulative, cunning, and deceitful" and that he has a motive and the intellectual capability "to maintain a deliberate ploy or ruse to avoid his execution." The trial court emphasized that Battaglia has a motive to exaggerate his symptoms of mental illness in order to avoid execution. The court in *Wood* also observed that Wood had a motive to fabricate his purported delusions.

Second, although Wood testified at his competency hearing and Battaglia did not, both courts found the defendants not credible. Battaglia's failure to testify, and hence his failure to allow the trial court to observe his demeanor in person, left the trial court with only the video and audio recordings of Battaglia as evidence of his credibility and believability. When the audio and video recordings of telephone calls and interviews were viewed by the trial court in the context of the expert opinions, the trial court saw Battaglia as a very manipulative and intelligent person. We find that the trial court's assessment of Battaglia's credibility (or lack thereof), derived from writings, recordings, and jail calls, is supported by the record. Battaglia's jail calls demonstrate his awareness and insight into his current legal situation. In one call with his father, Battaglia states that he is "doing the best I can, alright. They're going to kill me December 7th, ok, no matter what. So whatever I do I'm gonna [sic] try to keep that from happening;" "I can't sit here and just do nothing. That's how everybody else gets killed;" "It's a damn chess game." In another call, Battaglia said "I've been trying to let everybody know how competent I was, but I wasn't sure if I was being successful or not." Battaglia described it as "the old

---

**163.** *Wood v. Thaler*, 787 F.Supp.2d 458, 480– 85 (W.D. Tex. 2011).

Catch-22" that "You can't be incompetent unless unless [sic] you think you're not incompetent." Battaglia told his father, "it's been awhile since I've read Joseph Heller." [164]

In addition, both courts found the timing of the defendants' claims of execution incompetency to be suspicious. In this case, the trial court found it significant that approximately two weeks before his initial execution date, Battaglia requested and was provided with a copy of the Supreme Court's *Panetti* opinion. Moreover, both courts found it significant that the defendant in each case did not exhibit signs of mental illness during their more than decade-long incarcerations on death row. In *Wood*, the court noted that, although Wood showed signs of having an antisocial personality and was impulsive and manipulative, he did not reveal evidence of delusions, paranoia, or suicidal/homicidal ideation.[165] In this case, Battaglia was on death row for more than fourteen years, but he was never prescribed any psychotropic medication, had not been on the mental health caseload, and had not raised any red flags during the mandatory 90-day mental status exams. Dr. Womack found it significant that in fourteen years on death row Battaglia has not exhibited signs of mental illness. In addition, Dr. Allen expressed "concerns and skepticism" that over the last 14 ½ years, the TDCJ records did not reflect any "psych referrals." Dr. Allen admitted that "every mental status report that [he] looked at showed normal limits." In fact, Dr. Allen's testimony was notably less certain with regard to Battaglia's execution competency than was his report, and this decline in certainty appeared to be due to the absence of evidence of mental health issues while Battaglia was on death row.

Moreover, both courts found the expert witnesses who had worked with the Federal Bureau of Prisons to be the most credible of all of the expert witnesses who evaluated the defendants. In *Wood*, the court found Dr. Conroy more credible than Dr. Roman, due to her experience working with the Federal Bureau of Prisons. In this case, the trial court found that Dr. Womack was the most qualified out of the four experts to make a determination of competency to be executed.

We conclude that this finding by the trial court is supported by the record, and we agree with the trial court's application of *Wood* under the facts of this case.

## E. The Trial Court Found Dr. Womack's Expert Opinion to be the Most Credible

 The trial court accepted as conclusive the following conclusions rendered by Dr. Womack:

- that Battaglia is feigning or exaggerating his symptoms of mental illness. Battaglia has the motive and intellectual capability to maintain a deliberate ruse to avoid his execution.
- that the PIA test tells you what the questions are looking for so an intelligent person could fake the results on that test. Also, having access to pending case law would help a person fake symptoms and examinations.

164. Joseph Heller authored the novel *Catch-22*, a title synonymous with having a contradictory choice that is considered a negative outcome no matter which choice is made. The "catch" in *Catch-22* was that a man was considered insane and thus not eligible to fly if he was willing to fly highly dangerous combat missions, and so requesting to be relieved of such missions because they were so dangerous showed that he was sane enough to be eligible (and thus was required) to fly them.

165. *Wood*, 787 F.Supp.2d at 474.

- that, had Battaglia suffered from delusions, there would be a high likelihood that TDCJ personnel would expose the likelihood of such a mental illness.

- that the comments Battaglia made denouncing the morals of his ex-wives and of law enforcement and the legal system in Dallas were off-handed, inconsistent, and sporadic, and they were not reflective of a true delusional disorder.

- that intelligence and repetitive test taking could result in a false test result.

- that Battaglia did have features of a personality disorder relating to narcissistic and anti-social areas.

- that Battaglia changed his story about his factual understanding of the reason he is being executed which is inconsistent with having a fixed delusional disorder. Battaglia's complaints were remarkably non-specific. Battaglia's "inability to fully elucidate the details of his conspiracy theory [makes] it questionable whether [Battaglia's] purported belief system was truly a delusion."[166]

- that Battaglia possesses an accurate understanding that he was convicted of murdering his two daughters; he understands his execution date is December 7, 2016; and he understands that someone who killed two girls and was convicted of such a crime would receive the death penalty. Moreover, since Battaglia has told different versions of his offense,

admitting all or some culpability, his denials are inconsistent.

The trial court concluded based upon Dr. Womack's assessment, along with its own review of the evidence, that Battaglia is intelligent, sophisticated, and motivated enough to invalidate the mental health tests and create delusions reflecting that he does not have a rational understanding of his connection to the offense as a means of preventing his execution. The trial court concluded that Battaglia is malingering and does not suffer from a severe mental illness. The trial court believes that Battaglia is feigning or exaggerating his symptoms of mental illness. We hold that these findings of fact are supported by the record and are within the zone of reasonable disagreement.

Pursuant to such findings, citing to Article 46.05, the trial court concluded that Battaglia understands he is going to be executed, that his execution is imminent, and the reason for his execution.[167] Citing to *Mays* and *Panetti*, the trial court concluded that Battaglia has a rational understanding of the reason for his execution.[168] The trial court decided, therefore, that Battaglia has failed to prove by a preponderance of the evidence that he is incompetent to be executed.

## F. The Case Law Supports The Trial Court's Ruling

When we compare the above findings in this case with the facts from the execution competency cases discussed herein, we find very little difference between Battaglia and the other defendants who were found competent to be executed—Panet-

---

166. Battaglia's complaints were very similar to Wood's complaints about a conspiracy between his prosecutor and trial judge, which were found to be not credible in *Wood v. Thaler*. Moreover, as in *Wood*, Battaglia's complaints were non-specific. *Id.* at 489–90.

167. TEX. CODE CRIM. PROC. art. 46.05(h).

168. *Mays v. State*, 476 S.W.3d 454, 457 n.4 (Tex. Crim. App. 2015) (citing *Panetti*, 551 U.S. at 959, 127 S.Ct. 2842).

ti,[169] Green, Wood, Eldridge, and Ferguson.[170]

Like Battaglia, Scott Louis Panetti exhibited symptoms of a delusional disorder.[171] He claimed that his execution was part of a conspiracy to keep him from preaching.[172] And, as in this case, there was conflicting expert testimony regarding Panetti's competence to be executed. Like Battaglia, there was evidence that Panetti had a sophisticated understanding of his case, and there was some evidence of malingering, exhibited by his normal telephone conversations with his family members.[173]

Like Battaglia, Jonathan Marcus Green said he believed that he was set up by the corrupt police. Green, like Panetti, was diagnosed as a delusional schizophrenic. Dr. Mosnik testified in Green's competency hearing that Green was incompetent because of his delusions, and she testified in Battaglia's competency hearing that Battaglia was incompetent because of his delusions. In neither case were her opinions followed by the courts. It was not an abuse of discretion for the trial court to find Green competent to be executed even though there was expert testimony that Green was competent to be executed and expert testimony that Green was incompetent to be executed. Just because Green

was claiming his innocence did not make him incompetent.[174]

Like Battaglia, Jeffery Lee Wood claimed to have persecutory delusions that the legal community was out to get him because it was full of corrupt judges and lawyers. As in the other cases, there was conflicting expert testimony on execution competency, and the trial court found one expert's testimony more credible than the other's, opining that Wood's delusions were self-serving beliefs that were typical in the Death-Row environment. As in this case, the trial court found that Wood was not delusional so as to be incompetent for execution since the conspiracy theory is common among inmates.[175]

Like Battaglia, John Ferguson functioned adequately without anti-psychotic medications for over a decade on death row.[176] Ferguson, a paranoid schizophrenic, had genuine delusional beliefs. As in this case, there were conflicting expert opinions. But, in this case, as in *Ferguson*, it was not "objectively unreasonable" for the trial court to credit the opinion of one expert over the other experts.

Like Battaglia, Gerald Cornelius Eldridge also expressed delusional beliefs. He claimed, among other things, that the

169. We are only able to compare evidence regarding Battaglia's execution competency with the evidence relating to Panetti's execution competency that was re-analyzed in 2008 by the federal district court and adjudicated using the correct standard that had been set out in *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). *See Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498 (W.D. Tex. Mar. 26, 2008), *aff'd sub nom. Panetti v. Stephens*, 727 F.3d 398 (5th Cir. 2013), *cert. denied* —— U.S. ——, 135 S.Ct. 47, 190 L.Ed.2d 52 (2014).

170. *See generally Green v. State*, 374 S.W.3d 434 (Tex. Crim. App. 2012); *Ferguson v. Sec'y, Flo. Dep't of Corr.*, 716 F.3d 1315 (11th Cir.

2013); *Eldridge v. Thaler*, No. H-05-1847, 2013 WL 416210 (S.D. Tex. Jan. 31, 2013); *Wood v. Thaler*, 787 F.Supp.2d 458 (W.D. Tex. 2011).

171. *Panetti v. Stephens*, 727 F.3d 398, 403 (5th Cir. 2013).

172. *Id.* at 404.

173. *Id.* at 405.

174. *Green*, 699 F.3d at 418.

175. *Wood*, 787 F.Supp.2d at 499–500.

176. *Ferguson*, 716 F.3d at 1341–42.

prison guards were poisoning his food. As with the other cases, there was conflicting expert testimony—two experts found him competent to be executed, two found him incompetent to be executed. But, as in this case, it was held that his claimed beliefs were self-serving, and there was evidence to support a finding of malingering, thus the trial court's conclusion that he was competent to be executed was upheld.

We also find significant the differences between Battaglia and the defendants in the cases discussed herein who were found incompetent to be executed—Billiot and Madison.[177] Unlike Battaglia, James Billiot suffered from severe chronic schizophrenia. He did not understand that he was going to be executed, but rather he believed he was going to be released. Therefore, the record in *Billiot* supported the court's conclusion that he did not have a rational understanding that he was going to be imminently executed.

Unlike Battaglia, Vernon Madison had suffered several strokes that caused vascular dementia and retrograde amnesia. The credible expert testimony and medical records supported the court's conclusion that Madison had no memory of ever having committed a murder.[178] The experts agreed that Madison's strokes impaired his cognitive functioning. Significantly, unlike in this case, all experts agreed that there was no indication that Madison was malingering. Thus, there was no evidence in the record to support a conclusion that Madison had a rational understanding of the link between his crime and his execution. By contrast, in this case, there is evidence in the record to support the trial court's

ruling that Battaglia is malingering and therefore competent to be executed.

## CONCLUSION

Recognizing that it was within the trial court's discretion to evaluate the weight and credibility of the conflicting evidence, we hold that the record supports the trial court's determination that Battaglia is competent to be executed. Battaglia knows he is to be executed by the State, he knows he was convicted of killing his daughters, and he knows his execution is imminent. There is support in the record that Battaglia is malingering. Even though he denies being involved in the murders of his daughters, there is evidence in the record supporting the conclusion that he comprehends that there is a "causal link" between the capital offense and his imminent execution beyond merely identifying the State's articulated rationale for the execution.

Therefore, the trial court's decision that Battaglia failed to establish by a preponderance of the evidence that he is incompetent to be executed was within the zone of reasonable disagreement and not an abuse of the trial court's discretion. The stay of execution is lifted. We remand to the trial court to set Battaglia's execution date.

Alcala J. filed a dissenting opinion.

Alcala, J., filed a dissenting opinion.

At what point does a defendant's severe mental illness rise to the level that it renders him incompetent to be executed for capital murder under the applicable law in the Eighth Amendment to the federal

---

177. *Billiot v. Epps,* 671 F.Supp.2d 840 (S.D. Miss. 2009); *Madison v. Comm'r, Ala. Dep't of Corr.,* 851 F.3d 1173 (11th Cir. 2017).

178. We express no opinion regarding the issue of whether having no memory of committing an offense is equal to being incompetent

to be executed. That issue is not before this Court. We simply point out that the facts in *Madison* supporting the court's conclusion that Madison was incompetent to be executed are not present in this case.

Constitution and Texas statutory law? I conclude that under this applicable law, a defendant is incompetent to be executed when (1) he does not understand that he is to be executed and that the execution is imminent, or (2) he lacks a rational understanding of the reason for his execution due to delusions stemming from a severe mental illness that place his awareness of the connection between his crime and his punishment in a context so far removed from reality that the punishment can serve no proper purpose. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007); *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); TEX. CODE CRIM. PROC. art. 46.05. Rather than apply this standard for competency determinations, this Court's majority opinion instead enacts a more burdensome standard for the defense as to the second prong. This more burdensome standard permits a finding of competency when a defendant is aware of a causal link between his crime and execution, even if his understanding is based on a significant impairment of his perception of reality due to a delusional disorder. In the instant case, in pertinent part, the defense contends that John David Battaglia, appellant, is incompetent to be executed because, even though he may acknowledge the State's reasons for seeking to execute him, he lacks a rational understanding of the reason for his execution due to a delusional disorder that significantly impairs his perception of reality. The defense argues that the trial court erred by relying on the conclusions of a sole expert who mistakenly failed to consider that, under the applicable law, a person is incompetent to be executed when his awareness of the link between his crime and impending execution is in a context so far removed from reality that he cannot understand the purpose or meaning of the punishment, despite the fact that he may demonstrate a factual understanding of the State's reasons for seeking to execute him. I agree with the defense that, because the sole expert who determined that appellant was competent mistakenly failed to consider the proper applicable law in reaching his conclusions, the trial court erred by adopting that expert's conclusions. I would remand this case to the trial court for reconsideration of the evidence under the proper legal standard that requires an examination of whether the defendant's awareness of the reason for his impending execution is so distorted by his delusional thinking that the punishment can serve no proper purpose. Accordingly, I respectfully disagree with this Court's majority opinion's description of the applicable law in a manner that appears to permit a finding of competency based on a defendant's acknowledgment of a causal link between his conviction and punishment, in spite of his delusional beliefs, and its holding that improperly defers to the sole expert's conclusions that are premised on an incorrect standard for competency determinations. I, therefore, respectfully dissent. To explain my reasoning, I review the applicable law governing the competency-to-be-executed inquiry, and I then discuss the evidence in the record and the trial court's findings of fact and conclusions of law to show why the trial court's ruling fails to comport with the law.

## I. The Applicable Law Sets Forth a Competency Standard That Must Be Applied in this Case

I respectfully disagree with this Court's overly restrictive view of the standard for evaluating a defendant's competency to be executed that imposes a more onerous burden on the defense in order to establish incompetency. While I agree with this Court's majority opinion's suggestion that

Texas's competency-to-be-executed statute does not fully encompass all of the applicable law for competency determinations in this context, I part from the majority opinion with respect to the standard that should be applied. As to the defendant's understanding of the reason for his execution, this Court's majority opinion's standard requires that a defendant demonstrate that he either (1) lacks an understanding of the fact that his execution will occur imminently, or (2) lacks a rational understanding of the reason for his execution, in the sense that he cannot understand the causal link between his crime and his punishment. Although I do not disagree with any of these aspects of the majority's standard, I believe that its standard is incomplete because, as I will explain further below in my discussion of the relevant law, the proper standard also requires that a defendant's awareness of the link between his crime and his punishment not be in a context so far removed from reality that his execution could serve no proper purpose. Because the Texas statute was enacted to codify the *Ford* decision, I review the requirements of *Ford* and Article 46.05 before I turn to my discussion of the *Panetti* decision that was decided about two decades after *Ford*.

### A. The Texas Statute and *Ford* Disallowed the Execution of a Person Who, Due to Severe Mental Illness, Was Incompetent to Be Executed

In *Ford*, the Supreme Court held for the first time that the Eighth Amendment prohibits the execution of the insane. 477 U.S. at 401, 106 S.Ct. 2595. In reaching that conclusion, the four-judge plurality opinion questioned whether there was any retributive value in executing a person "who has no comprehension of why he has been singled out and stripped of his fundamental right to life," and it further observed

that civilized societies would feel "abhorrence" at "killing one who has no capacity to come to grips with his own conscience or deity[.]" *Id.* at 408, 106 S.Ct. 2595. The plurality opinion concluded that the Eighth Amendment barred the execution of "one whose mental illness prevents him from comprehending the reasons for the penalty or its implications." *Id.* at 417, 106 S.Ct. 2595. Although recognizing that the Constitution would bar the execution of those who are unable to comprehend the reasons for or implications of the death penalty, the plurality opinion in *Ford* did not attempt to more precisely define the degree of severe mental illness that would fall within the Eighth Amendment's prohibition against executing such individuals.

In his concurrence to the plurality opinion in *Ford*, Justice Powell sought to more clearly define the scope of the Eighth Amendment prohibition in this context. He observed that executing an insane person would "impose a uniquely cruel penalty" and would be inconsistent with the retributive purpose of the death penalty, which "depends on the defendant's awareness of the penalty's existence and purpose." *Id.* at 421, 106 S.Ct. 2595. Given this, Justice Powell opined that, to comply with the requirements of the Eighth Amendment, those who are subject to execution must "know the fact of their impending execution and the reason for it." *Id.* at 422, 106 S.Ct. 2595. He further explained that, "[i]f the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied." *Id.* Accordingly, Justice Powell indicated that he would have held that the Eighth Amendment forbids the execution only of those individuals who are, by virtue of their insanity, "unaware of the punishment they are about to suffer and why they are to suffer it." *Id.*

After *Ford*, Texas codified the ultimate holding of that decision in Code of Criminal Procedure Article 46.05. Subsection (h) in Article 46.05 sets the standard for incompetency by providing that a defendant is incompetent to be executed when he does not understand (1) that he is to be executed and that the execution is imminent, and (2) the reason he is being executed. *See* Tex. Code Crim. Proc. art. 46.05(h). But, as this Court's majority opinion appears to recognize, the second prong in the statute is presently incomplete in that it fails to conform to the constitutional requirements for competency determinations that were later clarified by the Supreme Court's *Panetti* decision, which I discuss next.

**B.** *Panetti v. Quarterman* **Clarified that a Defendant's Understanding of the Link Between His Crime and His Impending Execution Must Not Be Significantly Impaired By Delusions Stemming From Mental Illness**

The Supreme Court's majority opinion *in Panetti* clarified the meaning of its plurality opinion in *Ford*. *Panetti* clarified that a defendant's understanding of the link between his crime and his impending execution may not be premised solely on his acknowledgment of the State's reasons for his execution, and it further required that his understanding of that link not be so distorted by delusional thinking that he could have no real understanding of the meaning or purpose of the punishment. Although this Court's majority opinion relies on *Panetti* for its analysis, and al-

though it incorporates much of the analysis set forth in *Panetti*, I respectfully suggest that this analysis falls short of the constitutional requirement that a defendant's understanding of the link between his crime and his execution must not be in a context so far removed from reality that his execution can serve no proper purpose.

**1.** *Panetti* **Required a Defendant's Rational Understanding of the Causal Link Between His Crime and Punishment to be Tethered to Reality**

In *Panetti*, the Court clarified the meaning of *Ford* by holding that a person sentenced to death cannot be executed unless he has a rational understanding of the fact that he is going to be put to death and of the reason for his execution. *Panetti*, 551 U.S. at 958-59, 127 S.Ct. 2842. The Court explained that such a formulation of the standard was consistent with the reasoning and holding in *Ford*, in which the Court had determined that it would serve no retributive purpose to execute an individual who lacks comprehension of why he has been singled out for the death penalty or who has no capacity to come to grips with his own conscience. *Id.* at 957, 127 S.Ct. 2842 (citing *Ford*, 477 U.S. at 409-10, 106 S.Ct. 2595).

Regarding the evidence in Panetti's case, the Supreme Court observed that there was "much in the record to support the conclusion that [he] suffers from severe delusions." *Id.* at 955-56, 127 S.Ct. 2842.[1] Nevertheless, the federal district

---

1. In assessing the evidence in that case, the Court observed that one expert had opined that Panetti had a "genuine delusion" involving his understanding of the reason for his execution. *Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). According to that expert, although Panetti claimed that he understood that the State wanted to execute him for his murders,

he "believe[d] in earnest that the stated reason is a 'sham' and the State in truth wants to execute him" for some other reason unrelated to his crime—to stop him from preaching. *Id.* at 954-55, 127 S.Ct. 2842. Although other experts had resisted the conclusion that Panetti was incompetent because he appeared capable of understanding certain concepts and, "at times, [was] clear and lucid," ulti-

court had rejected Panetti's claim that he was incompetent to be executed by reasoning that the Eighth Amendment requires no more than that a defendant know the fact of his impending execution and the stated reason for the execution, and the Fifth Circuit Court of Appeals affirmed that determination. *Id.* at 942, 127 S.Ct. 2842. The Supreme Court reversed, holding that the lower courts had erred by employing an approach that was "too restrictive to afford a prisoner the protections granted by the Eighth Amendment." *Id.* at 956-57, 127 S.Ct. 2842. The Court reasoned that the lower courts' standard that treated Panetti's delusional belief system as irrelevant so long as he was able to articulate the State's proffered reason for his punishment was inconsistent with the reasoning of *Ford. Id.* at 958, 127 S.Ct. 2842. It explained that the *Ford* plurality and concurring opinions "nowhere indicate that delusions are irrelevant to 'comprehen[sion]' or 'aware[ness]' if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution." *Id.* The Court concluded that, contrary to the lower court's reasoning, "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it," and that "*Ford* does not foreclose inquiry into the latter." *Id.* at 959, 127 S.Ct. 2842. The Court thus rejected the lower court's standard as being incompatible with the requirements of the Eighth Amendment. *Id.* It explained that Panetti was entitled to consideration of his argument that "he suffers from a severe, documented mental illness that is the source of gross delusions

preventing him from comprehending the meaning and purpose of the punishment to which he has been sentenced." *Id.* at 960, 127 S.Ct. 2842. The Court determined that a defendant's delusional beliefs regarding the link between his crime and his punishment could put his understanding of that link in a context so far removed from reality that he could not possibly have a rational understanding of the purpose for his punishment or its implications. *Id.* at 960, 127 S.Ct. 2842. The Court said,

> Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose. It is therefore error to derive from *Ford*, and the substantive standard for incompetency its opinions broadly identify, a strict test for competency that treats delusional beliefs as irrelevant once the prisoner is aware the State has identified the link between his crime and the punishment to be inflicted.

*Id.*

In announcing its holding, the Court in *Panetti* cautioned that it was "not attempt[ing] to set down a rule governing all competency determinations." *Id.* at 960-61, 127 S.Ct. 2842. The apparent reason for this lack of a more precise rule was the procedural posture of Panetti's case—the Court explained that the record was "not as informative as it might be," given that the lower court's factual findings had necessarily been colored by the improper standard of review.[2] Given the undevel-

mately the Court concluded that there was significant evidence that Panetti was delusional regarding the reasons for his execution. *Id.*

**2.** With respect to this matter, the Court stated,

In overseeing the development of the record and in making its factual findings, the District Court found itself bound to analyze the question of competency in the terms set by Circuit precedent. It acknowledged, for example, the "difficult issue" posed by the

oped state of the record, the Court indicated that it would be "difficult to amplify [its] conclusions or to make them more precise" at that juncture. *Id.* at 961, 127 S.Ct. 2842. The Court remanded the case for further proceedings. *Id.* at 962, 127 S.Ct. 2842. The Court noted that, on remand, "[t]he conclusions of physicians, psychiatrists, and other experts in the field will bear upon the proper analysis." *Id.* In addition, it stated, more generally, that "[e]xpert evidence may clarify the extent to which severe delusions may render a subject's perception of reality so distorted that he should be deemed incompetent." *Id.*

The *Panetti* Court's reasoning makes clear that a person is incompetent to be executed if he "suffers from a severe, documented mental illness that is the source of gross delusions preventing him from comprehending the meaning and purpose of the punishment to which he has been sentenced." *Id.* at 960, 127 S.Ct. 2842. I therefore agree with the Eleventh Circuit Court of Appeals's observation in a recent case that it is "not enough for the prisoner to merely recite the proffered reason for his execution. Instead, *Panetti* tells us we

must look at the prisoner's own 'concept of reality,'—particularly as it relates to the relationship between his crime and his execution." *Madison v. Comm'r Alabama Dep't of Corr.*, 851 F.3d 1173, 1184 (11th Cir. 2017). If the prisoner does not rationally understand the connection between the crime he committed and the punishment he is to receive due to his delusional thought processes stemming from severe mental illness, then the " 'punishment can serve no proper purpose' and cannot be carried out." *Id.* at 1177 (citing *Panetti,* 551 U.S. at 960, 127 S.Ct. 2842).[3]

I note here that several courts have suggested that the Supreme Court in *Panetti* left open the question before us today, which is how to define and apply the concept of "rational understanding" in this context. *See Madison,* 851 F.3d at 1184 ("Although *Panetti* identifies the concept of 'rational understanding' as the focus of the competency inquiry, the Court's opinion does not define the term."); *Ferguson v. Sec'y, Fla. Dep't of Corr.,* 716 F.3d 1315, 1318 (11th Cir. 2013) ("The bottom line of the *Panetti* decision is that there is not yet a well-defined bottom line in this area of the law."). I agree with those courts' as-

---

delusions allegedly interfering with petitioner's understanding of the reason behind his execution, but it refrained from making definitive findings of fact with respect to these matters[.] . . . . The District Court declined to consider the significance those findings might have on the ultimate question of competency under the Eighth Amendment. And notwithstanding the numerous questions the District Court asked of the witnesses, it did not press the experts on the difficult issue it identified in its opinion. The District Court, of course, was bound by Circuit precedent, and the record was developed pursuant to a standard we have found to be improper. As a result, we find it difficult to amplify our conclusions or to make them more precise.

*Panetti,* 551 U.S. at 961, 127 S.Ct. 2842 (record citations omitted).

**3.** The Eleventh Circuit in *Madison* concluded that a defendant with dementia resulting from a stroke who had no memory of committing the capital offense and believed he had not committed any crime was incompetent to be executed under *Panetti. Madison v. Comm'r Alabama Dep't of Corr.,* 851 F.3d 1173, 1189 (11th Cir. 2017). The Court explained its reasoning by stating, "A person cannot rationally understand why he is being killed if, according to his 'concept of reality,' he never committed a crime. . . . [D]ue to his dementia and related memory impairments, Mr. Madison lacks a rational understanding of the link between his crime and his execution. . . . A person does not rationally understand his punishment if he is simply blindly accepting what he has been told." *Id.* (citations omitted).

sessments that *Panetti* left open some questions for the lower courts to resolve regarding precisely how the rule of that case should be applied in practice. However, *Panetti* did not leave unanswered the substantive question of when a severely mentally ill, delusional defendant should be spared the death penalty due to his lack of a rational understanding of the reason for his punishment. As I have explained above, this aspect of *Panetti* plainly prohibits the execution of a severely mentally ill person whose gross delusions about the link between his crime and impending execution are on a basis untethered from reality so that his punishment can serve no proper purpose.

### 2. The Majority Opinion's Standard Permits A Finding of Competency Based on a Defendant's Awareness of a Mere "Causal Link," As Long as that Awareness is Not Based Solely on a Recitation of the State's Reason for Seeking to Execute Him

Although this Court's majority opinion properly recognizes that, to comply with the Eighth Amendment, Article 46.05 must be interpreted in light of *Panetti*'s "rational understanding" language, the Court's description of the applicable standard does not fully comport with the reasoning of that case. The portion of the majority opinion's standard that aims to effectuate the holding of *Panetti* is the requirement that a defendant comprehend that there is a "causal link" between his conviction and his imminent execution, beyond merely acknowledging the State's articulated rationale. The Court explains that a prisoner is competent to be executed under *Panetti* and Article 46.05

- if he knows he is to be executed by the State, he knows the reason he is to be executed, he knows that the execution is

imminent, and, despite any delusional beliefs or other mental illness he may have, and despite the fact that he may deny having committed the capital offense, he comprehends that there is a 'causal link' between his capital offense and his imminent execution, beyond merely identifying the State's articulated rationale for the execution.[4]

The majority opinion's standard is functionally the same as the one that was rejected in *Panetti*. As explained above, *Panetti* determined that a prisoner is incompetent to be executed if, in spite of his awareness of a causal link between his crime and his punishment, he suffers from gross delusions that put his awareness in a context so far removed from reality that the punishment can serve no proper purpose. *See Panetti*, 551 U.S. at 958-60, 127 S.Ct. 2842. Here, the majority opinion's formulation of the competency standard omits this aspect of *Panetti*'s reasoning, and thus it appears to permit the execution of a person who is able to identify a causal link between his conviction and his punishment through a delusional rationale. Although the majority opinion acknowledges that a defendant's understanding of this causal link must go beyond merely reciting the State's articulated rationale for executing him, its standard does not make clear how much farther this understanding must go, nor does it elaborate on how a delusional defendant might demonstrate that he lacks such an understanding.

Uncertainty surrounding the proper competency-to-be-executed standard following *Panetti* is understandable, given this Court's previous statements that appeared to minimize the substantive importance of that decision. In *Green v. State*, this Court's majority opinion indicated that *Panetti* "merely reiterated the established

---

4. Majority opinion, slip op., at 47.

requirements of *Ford.*" 374 S.W.3d. 434, 443 (Tex. Crim. App. 2012); This Court stated, "Our reading of *Panetti* does not find a mandate regarding how to weigh any particular evidence; instead, we read *Panetti* as instructing that evidence of delusions may not, categorically, be deemed irrelevant. Therefore, we hold that *Panetti* merely clarifies the *Ford* standard for determining whether an inmate is competent to be executed." *Id.*[5] These statements in *Green* could be misconstrued as minimizing the importance of *Panetti*'s illumination of the "rational understanding" requirement that was highlighted in that case under the particular facts the Supreme Court was considering in its review of the Fifth Circuit's holding that Panetti was competent based on his ability to acknowledge the State's rationale for his impending execution. *Panetti*, 551 U.S. at 959, 127 S.Ct. 2842. The Supreme Court's holding and rationale in *Panetti* to decide the issue in that case provides great insight into the application of the broader description of the law on competency that had been set forth by the plurality opinion in *Ford.*

I note here that, to the extent that a competency determination requires an assessment of whether a defendant is suffering from a severe mental illness, it is appropriate to consider the current medical framework in making such a determination. *See, e.g., Moore v. Texas,* —— U.S. ——, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017) (requiring determination of whether a person is intellectually disabled so as to render him ineligible for the death penalty by considering current medical frame-

work). Part of the Supreme Court's rationale in *Moore* was that, in making such determinations, courts should not resort to stereotypes about the intellectually disabled, but should instead look to current medical/clinical appraisals to determine whether a particular person meets the diagnostic criteria for intellectual disability. *Id.* at 1052. Applying that same principle in this related context, I would further hold that the assessment of competency to be executed should look more closely to the current medical framework for assessing the existence of severe mental illness with delusional aspects that would prevent a person from having a rational understanding of his impending execution. Such an approach would be consistent with the Supreme Court's statements in *Panetti,* in which it instructed the trial court on remand to consider the "conclusions of physicians, psychiatrists, and other experts in the field[.]" *Panetti*, 551 U.S. at 962, 127 S.Ct. 2842; *see also id.* (explaining that "[e]xpert evidence may clarify the extent to which severe delusions may render a subject's perception of reality so distorted that he should be deemed incompetent"). I would expressly hold that the inquiry should be focused more closely on whether the defendant has a current medical diagnosis of a severe mental illness with delusional aspects and on whether or to what extent that illness has affected his ability to fully and rationally comprehend his conviction and sentence.

To resolve any conflict between the Eighth Amendment and this Court's current standard for evaluating competency to be executed, I would hold, consistent

---

5. Other courts have made similar observations. *See, e.g., Ferguson v. Sec'y, Fla. Dep't of Corr.,* 716 F.3d 1315, 1318 (11th Cir. 2013) ("*Panetti* did not abrogate or otherwise reject the awareness standard articulated by Justice Powell [in *Ford*], nor did it impose a new, more rigorous standard for assessing compe-

tency to be executed.... What the Supreme Court rejected in *Panetti* was an overly narrow interpretation of *Ford* that deems a prisoner's mental illness and delusional beliefs irrelevant to whether he can understand the fact of his pending execution and the reason for it.").

with the reasoning of both *Ford* and *Panetti*, that a defendant lacks a rational understanding of the reason for his punishment if he suffers from gross delusions stemming from a severe mental illness that place his awareness of the link between his crime and his punishment in a context so far removed from reality that the punishment can serve no proper purpose. *Id.* at 960, 127 S.Ct. 2842. Under these circumstances, as the Supreme Court observed in *Ford*, executing such an individual would be inherently cruel and could serve no proper retributive purpose, and thus would violate the Eighth Amendment. *See Ford*, 477 U.S. at 401, 106 S.Ct. 2595. Furthermore, I would expressly hold that this inquiry into the extent of a defendant's delusional thinking as it relates to his rational understanding of the reason for his punishment requires more than the defendant's factual awareness that he was convicted of capital murder and sentenced to death for that offense so that his awareness is not based on a delusional rationale untethered to reality.

## II. Remand to Trial Court is Appropriate for It to Apply the Proper Standard

Having described the appropriate standard for evaluating a defendant's competency to be executed above, I now explain why I conclude that the trial court's failure to apply that standard in this case renders its ruling unworthy of deference by this Court. In contrast to the majority opinion that upholds the trial court's ruling, I conclude that the trial court erred by mistakenly applying an incorrect legal standard for evaluating appellant's competency and that this flaw necessarily tainted the trial court's ruling in this case. As I demonstrate below, the trial court was under the mistaken impression that Article 46.05 is adequate to afford all the protection that is required under the Eighth Amendment as

long as evidence of delusions is considered, and thus it misunderstood the applicable law that it used as the basis for making its findings of fact and conclusions of law. Then, in finding appellant competent, the trial court relied almost exclusively on the opinion of Dr. Womack, who was the sole expert out of the four experts who formed opinions in this case to find appellant competent, but the record shows that Dr. Womack reached his conclusions by applying an improper standard that did not fully incorporate *Panetti*'s requirement that a defendant have a "rational understanding" of the reason for his execution. In light of these flaws in the trial court's ruling, I would not defer to that ruling at this juncture but I would instead remand this case for the trial court to clarify its findings and conclusions in light of the proper standard.

### A. Comments Made By Trial Court During Competency Hearing Indicate That It Applied an Incorrect Standard

I first review several comments made by the trial judge during the competency hearing which suggest that he was mistaken in believing that Article 46.05 by itself is an adequate standard for evaluating a defendant's competency to be executed. These statements also reflect the trial judge's mistaken impression that *Panetti* is largely an unclear decision which stands for nothing more than the proposition that evidence of delusions must not be categorically ignored in assessing a defendant's competency to be executed.

One of the trial judge's two focuses on the law to apply was on the application of Article 46.05 to this case. At one point, for example, while questioning Dr. Proctor, the trial court asked, "But [appellant] is in your opinion competent under 46.05, but [ ] his delusions, in your opinion, are such that he doesn't have a factual understanding of what he did, an accurate factual

understanding of what he did?" The judge's questions suggest that he appeared to be focused on the portion of Article 46.05 addressing whether the defendant understood "the reason he or she is being executed." TEX. CODE CRIM. PROC. art. 46.05(h)(2).

The second of the judge's two focuses was on his perception that the *Panetti* decision required him to consider evidence of the defendant's delusions. The trial judge suggested that *Panetti* stood only for the proposition that he could not find appellant's delusions wholly irrelevant because the case was otherwise unclear about its competency standard. The trial judge stated,

> I read *Panetti* many times, and I read it very carefully. *Panetti* that hold [sic] that if the defendant lacks a rational understanding, that he's necessarily not competent to be executed. That's just not what—that's just not what the Supreme Court said. The holding is that once the prisoner meets the statutory definition of [Article] 46.05, I can't treat any delusional beliefs as irrelevant. That's the holding of the case. And if there's another Eighth Amendment analysis that has to be done, I'm going to do my very best to make that Eighth Amendment analysis.... But, you know, it explicitly says in *Panetti* that we reject the standard followed by the court of appeals, and we do not attempt to set down the rule governing all competency determinations. And that's—that's very clear in *Panetti*.

And so, you know, we can argue what our interpretation is, and I'm willing to listen to that all day long, but the matter is there's not a determination. So I'll do my best and the courts of appeals above me are going to do their best. But there's no point in arguing about what

*Panetti* stands for because it's clear that it's unclear.

These statements on the record from the trial judge suggest that he was operating under the mistaken impression that *Panetti* did not significantly alter the Article 46.05 competency requirements in any way. The trial judge also suggested that *Panetti* did not hold that a defendant must have a rational understanding of the reason for his execution, but that is precisely what the Supreme Court held in that case. My concerns regarding the trial court's application of an erroneous standard are further reflected in the trial court's findings of fact and conclusions of law, which I will discuss next.

### B. The Trial Court's Findings of Fact and Conclusions of Law Reflect That They Are Tainted By An Improper Standard

In its findings of fact and conclusions of law, the trial court correctly observed that a defendant must have a rational understanding of the reason for his execution, but at no point did it attempt to define what rational understanding means or explain how it was applying that term to this case. It is thus unclear from the face of the trial court's findings and conclusions whether the trial judge considered the "rational understanding" language from *Panetti* to be an essential part of the competency inquiry, or whether he instead considered that language to be merely redundant of *Ford*'s requirement that a prisoner "know the fact of [his] impending execution and the reason for it." *Ford*, 477 U.S. at 422, 106 S.Ct. 2595 (Powell, J., concurring).

To further complicate matters, the trial court made a finding that the three experts who determined that appellant was incompetent to be executed—Dr. Mosnik, Dr. Allen, and Dr. Proctor—all employed an "incorrect" standard for assessing his

competency, but the trial court's findings fail to particularly identify the flaw in the standard employed by those experts.[6] A review of those experts' conclusions, however, shows that they all found appellant incompetent to be executed by reasoning that appellant, although factually aware of the reason his execution, lacks a rational understanding of that matter due to a delusional disorder that significantly distorts his concept of reality.[7] Although the trial court declared these conclusions to be the product of an "incorrect" standard, on the contrary, these experts' analyses were consistent with the requirements of Article 46.05, *Ford*, and *Panetti*. Because the trial court identified these experts as applying the wrong standard when they in fact applied the correct standard, the only logical conclusion that can be drawn from this is that the trial court actually applied an incorrect standard. If the trial court disre-

garded the opinions of these three experts primarily because it was confused about the proper standard, then this fact alone would justify remanding the case for the court to clarify its findings and conclusions in light of the proper standard.

The remainder of the trial court's findings of fact and conclusions of law further reflect that it failed to fully incorporate *Panetti*'s "rational understanding" requirement into the standard for evaluating appellant's competency to be executed. Much like the analysis found objectionable by the Supreme Court in *Panetti*, here the trial court's findings and conclusions determined that appellant was competent based in part on appellant's understanding that if someone killed two people and he was convicted of killing those two people, then that killer could properly receive the death penalty. The trial court stated,

6. On page 8 of the trial court's findings of fact and conclusions of law, the trial court stated, "[T]he Court believes that three of [the experts] applied an incorrect standard when applying *Panetti* and for this reason and the reasons cited below the Court does not rely on these opinions." The trial court continued, "Three of the four experts opined the Defendant 'incompetent' under *Panetti* because of a persecutory delusional disorder. But, in evaluating that persecutory delusional disorder they used an incorrect legal standard that was provided by the defense counsel."

7. For example, in her written report, Dr. Mosnik concluded that appellant "does not demonstrate having a rational understanding of the punishment that he is about to suffer, in that he believes he is to be executed to prevent him from disclosing damaging information he believes he possesses against those he believes are persecuting him. Although he has factual awareness that an execution date has been scheduled and is imminent ... he does not believe that he will be executed because of his responsibility in committing the crime, due to the presence of his illogical, fixed, and firmly held delusional belief system." Dr. Mosnik found no evidence of malin-

gering based on her administration of several psychological testing assessments. Dr. Allen's written report observed that appellant expressed "a complex delusional system involving conspiracies" and, as a result, he is not rationally aware of the reason for his execution. Dr. Allen opined that appellant was not malingering because, among other factors, his delusions were persistent in that they were present prior to his trial and have continued consistently since then, and have "increased in intensity." Dr. Allen opined that it would take "extraordinary energy to consistently present" consistent delusional thinking over a long period of time if it were not genuine. Dr. Proctor concluded that appellant is "severely mentally ill due to a complicated persecutory delusional system" and that his understanding of the reason for his execution is thus "irrational, as he views it as stemming [from] a vast, complicated conspiracy against him that is part of a large, multifaceted cover-up, as opposed to being due to the commission of the capital murder." Dr. Proctor also opined that appellant was not malingering based both on his own administration of the M-FAST test and appellant's performance on the psychological assessments administered by Dr. Mosnik.

The Court finds wholly credible the opinions and conclusions of Dr. James Womack, that the Defendant possesses an accurate understanding that he was convicted of murdering his two daughters. He understands that his execution date is December 7, 2016. He understands that someone who killed two girls and was convicted of such a crime would receive the death penalty. He has told several different versions of his offense, admitting all or some culpability and his denials are inconsistent. The Court accepts as conclusive the opinion of Dr. Womack that the defendant is competent for execution.

This determination that appellant has a rational understanding of the reason for his execution, in part, because he recognized that a hypothetical person who commits capital murder could lawfully be subjected to the death penalty for that offense ignores the central focus of a proper competency inquiry that must address whether a defendant has a rational understanding of the reason for his execution in his own case. *See Panetti*, 551 U.S. at 960, 127 S.Ct. 2842. That he may understand that the State would be justified in imposing the death penalty against someone else for the same type of offense is wholly immaterial to the proper inquiry. This assessment by the trial court further reveals that it applied the incorrect standard to appellant's competency claim and thus its ruling was tainted by that error.

**C. The Sole Expert Who Determined that Appellant Was Competent to be Executed Did Not Employ the Correct Standard**

Because the trial court relied almost exclusively on the opinion of Dr. Womack in reaching its conclusion that appellant is competent to be executed, I will next address the evidence from Dr. Womack which reflects that he was also mistaken regarding the substantive standard governing the competency inquiry in this case.

Dr. Womack's written report focused primarily on the statutory elements set forth in Article 46.05 without considering the "rational understanding" requirement in *Panetti*. Dr. Womack opined that appellant is competent to be executed "per Texas Code of Criminal Procedure Article 46.05(h)" because he "understands he is to be executed, that the execution is imminent, and the reason he is being executed." Dr. Womack further explained, "Historical comments by [appellant] show he has long understood the criteria for competence to be executed, and his interview comments illustrate he understood them on both assessment dates." These observations by Dr. Womack in his written report demonstrate his emphasis on appellant's factual awareness of the State's justification for seeking to execute him, but at no point did Dr. Womack discuss the concept of "rational understanding" or suggest that this was an essential component of the legal inquiry.

This same theme was repeated during Dr. Womack's testimony at the competency hearing. At several points during his testimony, Dr. Womack emphasized that appellant has a "factual understanding" of the requirements for competency to be executed under Article 46.05, thus suggesting that he viewed this as the central requirement for a finding of competency. At one point, with respect to the evidence of appellant's delusions, Dr. Womack stated, "But in talking about the factual standard at hand [under Article 46.05], there was no indication that there was any distorted thinking that was preventing him from understanding those three [statutory] components." Later, Dr. Womack agreed with the trial court's suggestion that appellant was factually aware of the reason for his execution, consistent with the require-

ments of Article 46.05. Dr. Womack stated, "Yes, I have quotes of him [in my written report] that illustrate his factual understanding of the elements under question." At another point during the hearing, Dr. Womack stated with respect to appellant's ability to discuss the elements of Article 46.05 and the theory of incompetency underlying his ·case, "[T]hat's clear support for the Texas Code of Criminal Procedure criteria." Thus the record reveals that Dr. Womack's focus in his testimony was on whether appellant met the statutory criteria in Article 46.05.

At one point, the State asked Dr. Womack to directly address the concept of rational understanding, but his testimony reveals that he believed that concept could be determined by evidence that the defendant understood the State's reasons for seeking to impose the death penalty and that he was intelligent enough to comprehend the law on competency. Dr. Womack indicated that, in his view, appellant had demonstrated his rational understanding through his agreement with Dr. Womack's suggestion that whoever was responsible for killing his daughters could theoretically properly be subjected to the death penalty.[8] At another point during the hearing, the State again asked Dr. Womack about his understanding of the relevant standard. The following exchange occurred:

> State: In your second report, you talk a lot about how he understands the legal standard. He actually articulated to you why we're here having this proceeding and what the standard is

and why he thinks that he's getting this hearing, correct?

> Dr. Womack: Correct.

> State: Is it fair to say that that's a pretty rational understanding of what is required under the law to be competent?

> Dr. Womack: According to the Texas Code of Criminal Procedure, I think it's clear evidence that he has a factual understanding.

> State: Okay. And what about a rational understanding?

> Dr. Womack: Well—

> State: That's kind of the crux of the question because I know the doctors have all kind of looked at this from that perspective.

> Dr. Womack: Yes. And I think he has a rational understanding supported by the questions queried of me by the court earlier, that it—the questions and his response to the questions indicate that it is more likely than not that he does not have a delusional disorder.

Here, Dr. Womack's mistaken focus appeared to be on appellant's intellectual ability to understand the law on competency as his basis for finding that appellant did not have a delusional disorder, as compared to whether he had a rational understanding of the purpose of his impending execution due to his commission of the offense.

In sum, the record of the proceedings below reflects that the lower court applied an incorrect standard for evaluating ap-

---

**8.** As to this matter, the following exchange occurred:

> State: The very last sentence of your report ... you note that he admitted, technically, yes, if a person is—does commit capital murder, the State has the right to—that would justify their execution, correct?

> Dr. Womack: Yes ma'am.

> State: Did that demonstrate to you that he has a rational understanding between the charge of capital murder and being convicted of it and then the State actually carrying out the execution for that offense?

> Dr. Womack: Yes ma'am.

pellant's competency to be executed, and, as such, it is necessary to remand this case for further proceedings. Here, the trial court rejected the opinions of three experts by reasoning that their opinions were based on an incorrect standard, but, as explained above, the record shows that the trial judge was actually mistaken about the proper standard. The trial court relied almost exclusively on the opinion of Dr. Womack, but a close review of the record reveals that Dr. Womack's opinion was untethered from the requirements of *Panetti*, which dictates that the focus of the competency inquiry must be on whether a defendant has a rational understanding of the purpose for his punishment. *See Panetti*, 551 U.S. at 958, 127 S.Ct. 2842. Because it adopted Dr. Womack's opinion that was reached through application of an improper legal standard while rejecting the opinions of three other experts who reached contrary conclusions that were reached through a proper legal standard, this Court should not defer to the trial court's ruling. This Court should not permit the execution of a person who may be categorically exempt from the death penalty due to his severe mental illness in the name of deference to the lower court's ruling, where that ruling appears to have been based on a flawed interpretation of the law. Under these circumstances, I cannot agree with the majority opinion's decision to uphold the trial court's ruling without first giving the trial judge the opportunity to clarify his findings and conclusions in light of the proper standard.

### III. Conclusion

The record of the proceedings below suggests that the expert witnesses and the trial court did not apply a consistent legal standard for determining appellant's competency to be executed. Accordingly, I would, at this juncture, simply clarify that

the proper standard must take into account *Panetti's* "rational understanding" requirement, which prohibits the execution of a defendant who suffers from severe delusions that render him unable to rationally understand the meaning and purpose of his punishment. I would not hold that appellant is competent at this stage as this Court's majority opinion does, but I would instead remand this case to the trial court for further proceedings that apply a consistent and proper legal standard for deciding whether appellant is competent to be executed. I, therefore, respectfully dissent.